# EXHIBIT 1

## Affidavit Of Zafar A. Khan

EXHIBIT F2

## AFFIDAVIT

## COMMONWEALTH OF VIRGINIA

## CITY OF Herndon

I, Zafar A. Khan, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice (DOJ), make the following statement freely and voluntarily to Daniel Willard Jewell, who has identified himself to me as a Contract EEO Investigator for ATF, investigating a complaint of employment discrimination filed by Zafar Khan, knowing that this statement may be used in evidence. I understand that this statement is not strictly confidential and may be shown to any interested party with a legally recognized need to know.

I hereby solemnly swear or affirm, under penalty of law for perjury:

**Q1.   (a) Please state your full name, position title, grade and job series.  (b) Please also state your race, religion, birth date, skin color and national origin.**

A1.  (a) Zafar Ahmed Khan, Telecommunications Specialist, PD-0391-2

(b) Race.  Asian

Religion.  Islam

Birth date.  March 28, 1948

Skin color.  Light brown

National origin.  India and Pakistan

Initials _ZAK_

F2-1

Q2.    (a) What is the name of the office in which you work?  (b) What are the names of any other organizational branches, divisions or offices between your office and the Office of the Director for ATF?

A2.    Radio Communications Branch - RCB

Technical Support Branch – TSB

Office of Science and Technology - OST

Q3.    Who are your first and second level supervisors?

First level supervisor.  Samuel L. Ford

A3.    Second level supervisor  Brad A. Caldwell

Q4.    In general, what are your duties?  If you are a supervisor, how many individuals do you supervise and what are their positions and grade levels?

A4.    As a telecommunications specialist, I provided technical support and assistance in LMR (Land Mobile Radios) to Baltimore Field Division and all affiliated offices. My position description had five critical elements that were used to derive ratings in individual element and then a final overall rating. Following are the five critical elements with a brief description of each element.

Critical element One – **Technical Expertise**

- Completes coverage surveys, compatibility studies, evaluates and optimizes equipment performance, designs communication systems and installs and repairs or causes the installation and/or repair of communication equipment.

F2-2

Initials 7Au

- Completes preventive maintenance as required and corrective maintenance.

- Applies a comprehensive knowledge of field investigative communication strategies and requirements in order to establish tactical communications.

## Critical element Two – **Leadership**

- Shows comprehension of the Bureau's mission and goals with respect to reducing violent crime, protecting the public and collecting revenues such when supporting strategic and tactical enforcement operations within an assigned area.

- Keeps abreast of current communications technologies and assists in determining applicability to the Bureau's needs.

- Actively seeks existing or initiates new training opportunities to maintain proficiency and broaden level of expertise.

- Continually and energetically applies to additional duties and follows through to completion.

- Continually demonstrates a willingness to work as part of a team when required.

## Critical Element Three – **Conduct and Cooperation**

- Presents a professional image in appearance and demeanor.

- Displays a positive and cooperative attitude towards responsibilities, coworkers, professional contacts, and the public.

- Is reliable and dependable and demonstrates such through efficient management of time, funds, and other resources.

## Critical Element Four – **Customer and Professional Relationships.**

F2-3                    Initials _ZAL_

- Reputation of dependability well known to radio users for communications support and/or special projects.

- Courteous, respectful and polite when interacting with customers showing concern when meeting needs and solving problems.

- Serves as a representative of the Bureau and work center when assigned to technology working groups.

- Professional relationships with counterparts and representative of other Federal, State, and Local Law enforcement agencies for interaction on joint projects and exchange of information and ideas.

Critical Element Five – **Oral and Written Communications**.

- Prepares trip reports, surveys, preventive maintenance and administrative documents.

- Demonstrates oral and written communications skills that are effective in delivering information to recipients.

- Prepares and conducts presentations and briefings on communication programs.

- Demonstrates excellent preparation when briefing the Branch Manager/Chief on communication matters.


**Q5.    You allege that you were retaliated against for your EEO activity.  Please state what your EEO activity consists of and provide dates, names of management officials who were involved and the current status of your past activity.**

Initials _ZAz_

F2-4

A5.    On March 10, 2002, I contacted the ATF's internal EEO office (Marlene Curry) and raised concerns that I was facing discrimination based upon race, religion, and national origin. I believe said EEO office interviewed Sam Ford. Sam Ford told me that these issues could be resolved without going through the EEO and encouraged me not to follow the EEO route. There was also an issue with a derogatory memo that one of my supervisors had placed in my personnel file without my knowledge and had refused to expunge it from it. I had brought to Ms. Curry's attention that discrimination was an ongoing process and that I was being treated differently from my counterparts at RCB (Radio Communications Branch) in terms of certification requirements, training, work opportunities and promotion. Below are some of the factors I brought to the EEO office.

**Certification Requirements.**

I was treated differently than my colleagues in terms of training and other professional matters. In 2001, Mr. Bowks subjected me to a remedial training program without any legitimate reasons. Few months after completion of the remedial training program, he required me to demonstrate my skills to my counterpart in Atlanta who had similar position description as mine. This was an arbitrary and unprecedented requirement.   No one in the RCB ever went through that certification process.

**Training.**

I was treated differently than my colleagues in terms of On the Job training (OJT). All other new employees received two weeks OJT within days after coming on board. My OJT didn't start until June 1999, about a year after I began work at the ATF.

F2-5                    Initials ___

## Work assignment.

I was treated differently than my colleagues in terms of work assignments. Their work assignments and responsibilities fit their position descriptions. Every one of my counterparts provided technical support to one or more ATF divisions. Their daily work and accomplishments were determining factor for their annual performance ratings.

On the other hand, most of work that my supervisor assigned to me was not part of my position description. I never received any credit for the assigned tasks; most of them were labor-intensive (particularly onerous due to my more advanced age and poor physical health), ministerial, and clerical.

Mr. Bowks tasked me with mostly labor-intensive assignments such as helping Shipping Clerk with shipping and receiving activities, ordering accessories, preparing purchase orders, putting accessories with radios, shipping and data entry in Radio property database. In beginning of 2000, RCB gave me responsibilities of supporting Houston Field Division. I made several maintenance trips to different field offices of Houston Field Division. In January 2001, these responsibilities were suddenly taken away. RCB then put me in a remedial training program. During the remedial training, James Bowks continued assigning shipping and receiving, data entry and other tasks that had no correlation to my position description. In May 2001, I requested a meeting with Mr. Bowks in writing to discuss my job responsibilities that were not commensurate with the position I held. Mr. Bowks didn't hold requested meeting or addressed my legitimate concerns. Instead, he sent me to Atlanta for two weeks for evaluation of my technical expertise by a coworker. Even after being "certified" by my coworker, my work responsibilities didn't change and continued through the end of performance evaluation year.

## Promotion.

I was treated differently than my colleagues. All of them were promoted to GS-13

F2-6

Initials _____

arrived while I was on annual leave. My supervisor shipped the radios but used this action to mark down my performance rating.

My supervisor never trained me in the use of STU-III, yet he accused me of not faxing radio encryption codes to U.S. Custom Sector via STU-III. This was another factor he utilized in marking down my evaluation to "Unsatisfactory" rating. He also used second-hand information from a memo that one of my disgruntled coworker wrote on behest of my supervisor. Samuel Ford told me after mid-year evaluation discussion that he was going to put me on a PIP.

Samuel Ford treated me differently than my colleagues in terms of office visits. He never conducted an office visit during entire 2002-03-evaluation period to learn about various telecommunication projects that I had completed and those, which were in progress in support of Baltimore Field Division. I planned, and provided technical assistance and support in many law enforcement operations (CIMRT – Critical Incidence Management Response Team). I coordinated and conducted relocation of radio communication infrastructure when two ATF field offices moved to new locations. Mr. Ford didn't take any of my accomplishments into consideration and put me on a PIP in June 2003. By his actions, he treated me differently because my colleagues were given full credits for similar activities.

In August 2003, Sam Ford did not allow me to attend a free training seminar offered by a federal agency in ACU-1000 (equipment used in accomplishing interoperability in communication at Federal, State, and local level) in Raleigh, NC. Yet a few weeks later, he attended the very same training in Raleigh along with the rest of my colleagues. At this point, the training was not free. Similarly, in July 2003, he banned me from participating in an LMR group discussion that was attended by everyone from Radio Branch and three of my counterparts who traveled from different field divisions.

At the Radio Communications Branch, my PIP was allowed to become public information. James Bowks asked me about my PIP progress. That was

F2-8

Initials _Zh1~_

astonishing because it was supposed to be confidential matter. Then Sam Ford included my coworker Jeffrey Hueston in the PIP process.

I believed that a negative mid-year rating, letter of reprimand and PIP were clear discrimination based on my national origin, religion, ethnicity, and age, and also retaliation for my earlier EEO activity, I contacted EEO counselor in August 2003. Mediation process to resolve the issues failed because Sam Ford in the mediation session asserted that the relief I sought was not possible. He said that RCB would offer me to find another position and that the only position open at that time was a Shipping Clerk position in Radio Communication Branch. He also said that I will fail the PIP and that could lead to my removal from ATF.

On September 17, 2003, I filed a formal EEO complaint. There have been continued retaliations for my EEO activity since then to this writing as mentioned below.

- On September 22, 2003, Mr. Ford relieved me of all my responsibilities as a telecommunication specialist for Baltimore Field Division.

- On September 26, 2004, Sam Ford asked me to surrender the GOV (Government Owned Vehicle) that was issued to me to perform my duties as a Baltimore communication specialist.

- He stopped my AUO (Authorized Uncontrollable Overtime) pay that amounts to 25% of basic salary. All telecommunication specialists, Sam Ford and other RCB managers continue to receive AUO pay. This was done without changing my position description.

- On December 1, 2003, Sam Ford ordered me to return ATF credentials, building badge, office keys, cellular phone, pager, phone cards, programming computers, and all professional equipment that I used in commission of my duties.

- On July 31, I brought to his attention that he treated me differently than others. He affirmed that he treated different employees differently. His attitude had become very rude and harsh and he criticized me in public several time.

- Samuel Ford placed me on administrative duty status. He said that I would not perform any technical duties and he or Brad Caldwell would determine my daily tasks.

- On March 15, 2004, I was sick. I called Sam Ford at 6:47 and left a message on his voice mail-requesting sick leave. On March 16, 2004, I was asked for doctor certificate for one-day sick leave. This is an example of retaliation because federal regulations do not require a doctor slip for one day of sickness. I am not on a leave restriction status.

- I had an on the job injury and was under my doctor's instruction not to lift weights for six weeks. I gave a copy of that note to my supervisor. Sam Ford, despite that note, ordered me to do task that required lifting of boxes weighing in excess of 30 lbs. The tasks aggravated my injury necessitating me to leave work early on sick leave.

- My supervisor retaliated against me for my EEO activity blocking my remote access to official email. All other telecommunication specialists had remote access to ATF email server. Remote access to email was badly needed in order to prepare response to my EEO complaint.

- Samuel Ford and Brad Caldwell retaliated against me for my EEO activity by proposing my removal from ATF and from federal government. Samuel Ford didn't allow me time to prepare my rebuttal during office time because he contended that preparing rebuttal was my personal business and was not job related activity. It was necessary to prepare my response during office hours because all emails and data that was evidence were stored on ATF server. He also forbade me from taking the computer at

home. This was a discriminatory treatment because my counterparts as well as Ford and others take office computer home.

- Since filing EEO complaint, my supervisor's behavior and attitude has been very rude and demeaning. He criticized me in front of others many times. He engages in discussions with others on job related matters but hardly talks to me. Subsequent to physical assault on November 5, 2003, he forced me to work alone in the same general area where my assailant worked and dismissed my concerns for personal safety.

**Q6.** **According to the agency's letter to you, dated December 4, 2003, which accepted your complaint for investigation, you allege you were discriminated against because of your race, religion, age, skin color and national origin when you were suspended from your position between September 15 and 22, 2003. You asserted in your formal complaint that the suspension was based on your receipt of a citation for a minor HOV driving violation and was too severe a penalty for what you did. (a) Please explain, in detail, the circumstances leading up to your suspension, identify the individuals involved in your suspension and state why you believe you should not have been suspended; (b) State how you were harmed by the suspension; (c) Provide the names of any of your co-workers who you believe were treated more favorably under similar circumstances; (d) State why you believe the suspension was related to your race, religion, age, skin color and national origin.**

A6.    In June 2002, I received a citation for HOV violation. The citation was improperly written and I believed that a judge would have dismissed it. I appeared in court to defend the ticket and the judge imposed a fine. I appealed the judge's decision in circuit court because I was of the opinion that the Police Officer had lied in court. Before the case went to circuit court, the same officer

called me at my home and harassed me. He also threatened me that he would call ATF office of Internal Affairs to report the violation if I didn't withdraw my appeal. Under fear and intimidation caused by the Police Officer's call and his threat of dire consequences, and stress caused by my supervisor at work, I decided not to appeal the ticket in circuit court.

In March 2003, Sam Ford asked me to write a narrative about HOV violation. He said that he would forward it to SA Michael Moore of ATF Office of Internal Affairs. I promptly provided him with my narrative.

In March 2003, two special agents of the ATF Office of Inspection interviewed me about events leading to the HOV citation. I informed them about the threatening call that I had earlier received from the Police Officer. I explained to them that the citation was a result of my efforts and intent for the safety of the GOV that I was driving. I decided to take an alternate route that required use of HOV lane. Soon after I entered the HOV lane to take the alternate route, I got stopped. I considered myself on duty while driving that vehicle because GOV cannot be driven off-duty. Furthermore, at no point since I was issued the GOV have I found any mention in the GOV Regulations or the letter of authorization that I must report a minor traffic citation to my supervisor.

In June 2003, I was asked to meet with Tim McGinnis, Chief TOB who handed me a proposal for 7 days suspension for the violation. I contacted Ms. Roberta Alford, the NTEU steward, who represented me during oral presentation to Tim McGinnis. Ms. Alford brought to McGinnis' attention that the agency had suspended some special agents who were convicted of such serious offenses as driving while impaired while operating a GOV were suspended for less than seven days. She stressed that a non-agent should not receive harsher punishment for a violation that doesn't even warrant points on the driver's record than the special agents who were charged with driving under influence.

Ms. Roberta Alford of NTEU represented me during oral presentation in Timothy McGinnis office. She stressed to Mr. McGinnis that it was a minor violation compared to driving GOV while intoxicated. She argued that the convicted ATF personnel were given a much lighter punishment compared to seven-day suspension for HOV violation in the proposal. She also pointed out to him that the regulations regarding HOV citation were not clear and needed clarification. Ms. Alford opined that a letter of reprimand and counseling would be sufficient punishment for such a minor violation.

Mr. McGinnis summoned me to his office on Sept. 4, 2003 and suspended me from my position without pay for seven days starting Sept. 15, 2003.

The seven-day suspension constituted a punishment that does not fit the crime. In addition, there were several mitigating circumstances that Mr. McGinnis failed to take into consideration. I maintain that said failure coupled with the severity of the punishment further evinces discriminatory intent on the part of Mr. McGinnis and the involved ATF supervisors and managers.   Mitigating circumstances include:

- Rain on the day I received HOV ticket, causing extremely low visibility and traffic congestion on Dulles Toll Road.

- Concern about my own safety as well as that of the Government vehicle.

- Intimidation and harassment of the ticketing officer by his phone call to my home. A review of copy of investigation will reveal officer's admission that he called me at my home.

- Improper ticket (copy present in the file) as written.

I was in non-pay status for seven days (Sept. 15-22, 2003). My supervisor made an unauthorized and unnecessary telephone call at home during the suspension period. His contact was undesirable, unwarranted and uncalled for. It also caused mental anguish, stress, and fatigue and greatly disturbed my bed-ridden wife.

Initials _ZAL_

F2-13

**Q7.    You also allege you were discriminated against because of your race, religion, age, skin color and national origin when you were placed on a Performance Improvement Plan (PIP) for 90 days on or about June 20, 2003.  (a) Please explain, in detail, the circumstances leading up to your placement on this PIP, identify the individuals responsible for placing you on the PIP and state why you believe you should not have been placed on the PIP;  (b) What were the terms of the PIP and what occurred during the period of the PIP;  (c) State how you were harmed by the PIP;  (d) Provide the names of any of your co-workers who you believe were treated more favorably under similar circumstances;  (e) State why you believe the PIP was related to your race, religion, age, skin color and national origin.**

A7.    (a) On March 31, 2003, Mr. Ford discussed my mid year performance appraisal with me. He said that my mid year rating was unsatisfactory. Ford said that he based the negative evaluation on a certain memorandum that he had asked one of my coworker to write. Mr. Ford expressed that the memorandum justified unsatisfactory rating and that I was unable to perform basic functions of the job. He also attributed incompletion of some of the projects that he said he assigned to me as a justification for unsatisfactory rating. Ford said that he was considering putting me on a PIP for 90 days. On June 23, 2003, he put me on 90 days PIP. The PIP was further extended until Oct. 17, 2003.

I should not have been placed on PIP because at that time, I was functioning at full potential of my position. I had similar responsibilities and more than of my other coworkers serving different Field Divisions. In addition to serving Baltimore Field Division single-handedly, I was managing KMC OTAR IDs, managing radio property database, generating purchase requests for RCB, researching prices for radio products and placing order, holding meetings with vendors regularly and

acted as RCB representative during meetings with vendors. Additionally, I acted as a shipping and receiving clerk as frequently as my supervisors ordered me to do.

I hold two college degrees in physics and mathematics and have attended graduate courses in electrical engineering, mathematics, computer science, and social sciences. I do not believe that any of my coworkers, both telecommunications managers, and the RCB branch chief have that educational background or any college education. Due to my mathematics and physics background, some of my coworker depended upon me to seek assistance in resolutions of frequency and propagation issues while some called me a "mathematician, scientist" (Mike Donahue and Mike Butkiss).

For more than two years, I was responsible for fielding all MCD ID related questions, resolving duplicate IDS that were so prevalent in RCB and thus causing security concerns. My coworkers valued my assistance due to its timeliness and promptness. Another coworker in New York/Boston Divisions asserted that I had exceptional knowledge of LMR (Mike Schmidt). My supervisor at one point had assigned me to train newly hired telecommunications specialist.

My performance evaluations for the years prior to 2003 had been satisfactory despite the fact that the RCB managers discounted lots of my achievements. During the 9/11/01 tragedy, my supervisor declined to accept technical assistance I volunteered to provide at the Pentagon and in New York City. He said that I was a "security risk" without any elaboration. Instead, he had another coworker drove from Kansas City to New York for help. I was made to sit in an empty RCB office from 9AM-9PM for several days baby-sitting charged batteries that were never needed.

(b) Sam Ford had agreed to meet every Monday to discuss the PIP performance. He seldom met during the set-aside days. On the few occasions that we met, he provided negative feedback. During PIP period, he asked me to conduct radio coverage study alone. His proposed a method that required talking to self on one

F2-15

Initials

radio and attempting to listen on a second radio while driving around Baltimore County. On the other hand, it is a common practice that two people conduct such surveys.

Under the terms of PIP, I had to demonstrate the procedure for preventive maintenance of a portable and mobile radio, and a repeater to Mr. Ford. There was no set criteria or any objective performance measurement tool. Mr. Ford had me perform some tasks that I was performing at par with my counterparts for the last two years. Mr. Ford accepted my trip reports and preventive maintenance reports without any question.

During a PIP session, Ford had one of my coworkers present during the preventative maintenance demonstration. I objected to the coworker's presence, saying PIP was a confidential matter between Mr. Ford and myself. Mr. Ford responded that he did not know how to perform the preventive maintenance he was asking me to do, and therefore needed the coworker's presence there. Despite Mr. Ford's lack of knowledge, he somehow knew enough to rate me negatively.

I found that the PIP had no objective purpose whatsoever because his instructions were always vague and confusing. He was my supervisor during the 2002-03 evaluation period, but he never went with me to my Field Division or any office, never conducted an office review nor ever saw any of my work. Yet he asserted that my work was defective. Furthermore, he was more interested that I do menial tasks rather than spend time with my customers in the field office. Whenever I would go to provide technical assistance in the field, he would ask bizarre questions in a demeaning tone.

(c) I continued supporting Baltimore Field Division as a communication specialist during PIP until September 12, 2003. In this duration, I planned and supported very sophisticated law enforcement operations, performed preventive maintenance on equipment and remained engaged in my efforts to get a free of charge radio repeater site for Wilmington Field Office. Mr. Ford never questioned

F 2-16

Initials _____

quality of my work or technical support during the law enforcement operations or the maintenance trips.

On September 22, 2003, Samuel Ford unilaterally extended PIP through October 17, 2003 and abruptly stopped me from providing technical assistance and support to Baltimore Field Division. I continued receiving calls from field agents for immediate assistance and support. It was very difficult for me to inform my customers who depended on me for solving their communication related problems that I would be unable to assist them any longer. His action caused me to lose my professional image and reputation among my coworkers and customers. It also gave arise to speculations and rumors. I overheard one coworker telling a supervisor that I was incompetent.

I was professionally hurt because I was not doing the work commensurate with my job description. My work assignments became more of a secretarial nature and unpredictable.

Extension of PIP caused me to totally dissociate from a number of projects. As a result, I had to stop my contacts from various people I was dealing with. I am sure that many of them were left in limbo. One of them was an official from State of Delaware who had agreed to provide a requested radio site to ATF.

I have sustained tremendous emotional trauma, felt worthless, suffered with low self-esteem and mental anguish during and after PIP.

**Q8.    You also allege you were retaliated against because of your EEO activity when you were relieved of your responsibilities as a Telecommunications Specialist for the Baltimore Field Division on or about September 22, 2003. (a) What duties were taken away from you, who took them away from you and why did this happen? Please explain in detail; (b) Were any of these removed duties restored to you? Please explain why, what the duties were and when this occurred; (c) State how you were harmed by this action; (d) Provide the names of any of your co-workers**

F2-17

Initials

**who you believe were treated more favorably under similar circumstances;**
**(e) State why you believe this action was related to your EEO activity.**

A8.    (a) I was responsible for providing LMR assistance to Baltimore FD as Baltimore FD manager. The work consisted of resolving radio communications problems and issues, enhancing radio coverage, conducting site surveys, negotiating new sites, coordinating with vendors and traveling throughout my division to assist my customers. Ford took away those responsibilities and put me on administrative duty on December 1, 2003. As a result of his decision, I was not to do any radio communications work. He took away my credentials, building badge, cellular phone, all equipment and tools, programming software and computers and ATF related cloths and GOV that I used in performance of my duties. These GOVs are issued to all communications specialists. Ford said that I do not have necessary knowledge to perform my job without any elaboration. He stopped my AUO on Dec. 1, 2003 although my job description was never changed. AUO is earned by all communications specialists including him even when the employees are on leave or during holidays. Ford took office keys from me as well and put me strictly at 8:00-4:30 work schedule. For the next several weeks, he had me answer incoming telephone calls, do secretarial work, and clean garage and radio storage area as well as prepare boxes, and ship them. He forbade me from checking my official emails because he said that they were not important. Furthermore, he stopped me from preparing my response to his allegations, asserting that it was my personal business. He had my remote access to official email blocked and forbade me from taking the government-issued computer home, although Mr. Ford and all other employees take such computers home on a regular basis.

(b) The removed duties were never restored. My supervisor never explained to me why he didn't restore those duties. Instead, On Dec. 1, 2003, he asked me to surrender ATF credential, computer and work equipment, cell phone, pager, building badge and office keys. He put me on restricted duties and restricted work hours. He had already assigned my division duties to another



telecommunication specialist, although it was stipulated that the stop on my division responsibilities was temporary. On December 10, 2003, he served me with a notice of proposed removal from ATF and federal employment.

(c) I was hurt professionally and personally in terms of my professional image and personal job satisfaction. I was performing at an exceptional level all along. Suddenly, he took away professional responsibilities from me and transferred them to another coworker. That coworker later on became very irritated due to the additional duties and physically assaulted me on Nov. 5 in the RCB office. Ford continued assigning me tasks that required lifting of heavy boxes despite my doctor's instructions against lifting any weights for six weeks.  The work aggravated an injury that was caused in a work related auto accident.

(d) I don't know of any of my co-worker who lost use of a government vehicle. I don't know if any of my co-workers was placed in a PIP although we followed same maintenance procedures and had same job responsibilities. My co-workers had the advantage of having office visits from their supervisors; mine never conducted an office visit to my assigned field division. My co-workers were treated more favorably because they planned and scheduled their activities, whereas my priorities and assignments were set by my supervisor. I was expected to provide justifications before going to my assigned division; my co-workers had no such requirements. My coworkers were treated differently because they received credit for their work and accomplishments, whereas I received no credit for mine. Following were my co-workers who were treated differently.

Edward Cartossa, Jeffrey Hueston, Michael Schmidt, Richard Sizemore, Michael Donahue, John Harazda, Robert Jenkins, Rafael Puente, Edward Skalniak, Michael Butkiss, and Stephen Swift.

**Q9.    You also allege you were retaliated against because of your EEO activity when your use of a government vehicle was suspended on or about September 22, 2003.  (a) What kind of vehicle was involved, why did you previously have use of it and why was its use taken away from you? Please explain in detail;  (b) was its use restored to you?  State when and explain the circumstances;  (c) State how you were harmed by this action; (d) Provide the names of any of your co-workers who you believe were treated more favorably under similar circumstances;  (e) State why you believe this action was related to your EEO activity.**

A9.

(a) I was authorized a 1996 Chevy Blazer for HTW/WTH and for official business. The vehicle contained my test equipment, tools and other supplies to conduct official business during SRT, CIMRT and other law enforcement related activities. All telecommunication specialists are assigned GOVs for providing technical support and HTW/WTH use. ATF pays for the tags, repairs, maintenance costs and fuel. In September 2003, Sam Ford tool away my responsibilities and transferred those job functions to another telecommunication specialist. On December 2, 2003, Samuel Ford formally took away that vehicle from me.

(b) Sam Ford never restored the use of that or any other vehicle to me. I was required to drive my personal vehicle to work and to observe a restricted administrative work schedule where he assigned me ministerial type of work.

(c) I was personally and professionally harmed by this action. Firstly, he stopped me from performing responsibilities that my counterparts do in

Initials _Allc_

F2-20

Washington, DC and in the field. I had excellent professional relations with ASAC, RAC, TEO, TOO and all special agents within Baltimore FD. Ford caused these relations to end instantly, causing much confusion and leaving my customers in limbo. They continued calling me for technical support and assistance as they had been doing since Oct. 1, 2001 when I assumed LMR responsibilities for Baltimore FD. Ford's action caused me to immediately stop me from negotiating and acquiring a free of charge radio site in Dover, DE that Wilmington Field Office was anxiously waiting for due to increased ATF involvement in that area. Ford knew about that project and had asked me to go along with it a few months before having me stop all radio related work. His action also caused me personal anguish because I had to inform my customers not to call me anymore for technical assistance. Moreover, I was financially harmed because Ford stopped my AUO pay that instantly cut my salary by 25%. Additionally, his action caused me to have increased daily commute expenses because of daily use of POV instead of GOV.

(d) All communication specialists have use of GOV for HTW/WTH. Even the RCB Chief has GOV for HTW/WTH despite the fact that he doesn't participate in any law enforcement operations or activities. Additionally following telecommunication specialists have assigned GOVs.

Theodore Antonsen, Michael Butkiss, Michael Donahue, Michael Chom, Michael Schmidt, Richard Sizemore, Huel Benton, Ralph Puente, John Harazda, Richard Skalniak, Jeffrey Hueston, Swift, Edward Cartossa and Robert Jenkins. Brad Caldwell has a GOV as well. All the above as well as Sam Ford and James Bowks receive 25% AUO pay although Caldwell, Ford, and Bowks perform office work strictly.

(e) This action followed filing of my EEO complaint. My performance ratings for 1998-99, 1999-2000, 2000-01 and 2001-02 evaluation periods was satisfactory. I never received or heard of any customer complaints during my tenure as Houston Communication Specialist in 2000 (Assignment

lasted for less than a year and was abruptly taken away by James Bowks) and 2001-03 tenure as Baltimore Radio Specialist.

Before this action, I was performing at par with my co-workers with the same responsibilities. A series of negative actions started following my initial contact with EEO office. I experienced increased harassment, demeaning treatment and hostile work environment. Ford kept me at bay from doing LMR related work independently. I never received credit for my CIMRT support, preventative maintenance trips to field offices, providing support to other communication specialists during digital conversion of their divisions, writing codeplugs and programming radios for long hours under trying circumstances. Ford ensured that I spend as much time as possible at the RCB doing packing, shipping, receiving, stocking and other non-technical work that was incompatible with my position description. Removal from Baltimore responsibilities, seizure of government vehicle, proposal for my removal from ATF and Federal government followed filing of my Sept. 17, 2003 EEO complaint.

**Q10.  You also allege you were retaliated against because of your EEO activity when your PIP was extended until about October 17, 2003.  (a) Why was your PIP extended, what were the terms of the extension, what activities transpired in relation to and during the period of the extension and what was the outcome of the extension?  Please explain in detail;  (b) State how you were harmed by this action;  (c) Provide the names of any of your co-workers who you believe were treated more favorably under similar circumstances;  (d) State why you believe this action was related to your EEO activity.**

A10.  (a) Sam Ford extended PIP unilaterally without mutual consent. According to his memo of Sept. 22, 2003, Sam Ford indicated that the extension was made to make up for the missed days due to my sickness and suspension.

Per his memo, Ford relieved me of my duties from Baltimore Field Division during the extension. Me suspended HTW/WTH GOV privileges during the PIP completion time. During the PIP extension period, I arranged meetings with two vendors of radio LMR products and demonstrated preventive maintenance of a Quantar repeater and back-to-back repeaters configuration to Ford. Ford provided me with a list of frequencies and his own computer. I wrote a radio program for portable radios followed by a demonstration of the codeplug and the repeater operation to him.

In an annual performance rating meeting on Oct. 1, 2003 (during extended PIP) Mr. Ford notified me that my performance in all critical areas was unsatisfactory. He cited my failure to evaluate EFJ radio and problems with shipping as reason for my negative rating. He cited memo from other co-worker to be another justification for the negative rating.

Extended PIP ended on October 17, 2003. I requested a meeting with him to discuss the PIP outcome. It never took place. He didn't tell me the outcome of the PIP until December 10, 2003 when he told me that PIP was a failure and that he was proposing my termination from ATF and Federal Government employment.

(b) I was tremendously harmed by this action in terms of my emotional health. The PIP ended on Oct. 17 but Mr. Ford didn't disclose its outcome. He kept me thinking and guessing, greatly exacerbating my personal anxiety and anguish. He didn't restore my division responsibilities and the government vehicle. Instead, he started assigning labor intensive and non-technical tasks such as boxing and shipping radios, answering incoming telephone calls, preparing property transfer documents, cleaning bins and storing accessories. He did that without changing my job title or position description.

He inflicted financial loss upon me by stopping AUO pay that I was receiving since 1998.

F2-23

Initials

An instant 25% loss in pay caused me financial problems. I incurred additional monthly commuting expenses because of loss of government vehicle. I must point out that all my co-workers and the Branch Chief were allowed to use government vehicle for daily home-work-home commute.

I also suffered with loss of professional work that I did so well for my division. I lost all my customers whom I enjoyed giving undivided technical assistance. I also lost opportunities for solving problems and feeling satisfaction for jobs well done.

(c) I think that my co-worker Michael Butkiss made a contact with EEO. I don't know whether he made an initial contact or filed a formal complaint. However, I don't believe that Mr. Butkiss went through a PIP.

(d) This action followed filing of an EEO complaint and going through mediation process at the EEO office in Washington, DC.

**Q11. You also allege that you were verbally assaulted by a co-worker when the co-worker used the term "hello boys" in your presence. You further assert that you complained about the use of this term but your supervisors did nothing about it and even defended the co-worker's use of the term. (a) Explain this allegation in detail, including names of all individuals who were involved, the date of the incident and state what you and others said and did; (b) State how you were harmed by this incident; (c) Provide the names of any of your co-workers who you believe were treated more favorably under similar circumstances; (d) State why you believe this incident was related to your race, religion, age, skin color, national origin or your EEO activity.**

A11.

(a) Jeffrey Hueston used "Hello Boys" in his official emails salutation. I felt that the term "Hello Boys" was unprofessional and derogatory. In May

F-2-24

Initials _ZM_

2003, he sent an email to a group of people including me and used same phrase. I was offended so I respectfully and discreetly sent him an email requesting him to refrain from using "Hello Boys" phrase in his official emails. Upon receipt of my email, he became very angry, stood at the door of my office and loudly demanded to know why I thought the term "Hello Boys" was derogatory and demeaning. I requested him again not to use that term, upon which he became abusive. Hueston started using foul language filled with obscenities and vulgarities. He said that he will take off my name from his mailing list and that I would not receive any official email from him in future. He continued with his abusive language for some time and then left. Samuel Ford, my supervisor was in his office during Huston's verbal assault. He remained in his office, which was hardly 10 feet away from mine and did nothing to stop Mr. Hueston from using profanities. I was badly shaken from this episode and Mr. Ford's insensitivity. Subsequently Mr. Hueston blocked me from his email list resulting in loss of many emails on radio and technical matters that he sent to rest of the group. He stopped all conversations with me. Ford did nothing to resolve the situation.

I believe that James Bowks and Steve Russell may have heard the profanities as well. I remained in my office and tried to stay calm. I requested Mr. Ford to instruct Jeffrey Hueston not to use the offensive phrase in his official email in future. I believe he still continues to use that phrase.

(b) I was enormously harmed by this incident. I was badly shaken with the verbal assault that continued in presence of Mr. Ford and other employees. Mr. Ford didn't try to stop the verbal assault and rather defended Jeffrey Hueston. I became concerned about my personal safety because this employee maintained an office next to mine. RCB management did nothing to move him away from my office. Furthermore, Jeffrey Hueston deleted my name from his group list that resulted in loss

of undetermined number of technical and professional messages that he sent to all other communication specialists and the RCB management. One of my coworker asked me about a matter that was emailed to the entire group by this coworker.

(c) Ford has treated Jeffrey D. Hueston differently than me. Jeffrey frequently uses vulgar language at work. He verbally assaulted me and uttered obscenities. RCB management didn't stop him. On the other hand, Mr. Ford expressed to me that he treated different employees differently. In the past, Jeffery Hueston had told racial and religious jokes while in the office or on travel. His made jokes and statements that were anti-Islam, anti-Muslim and anti-Black. In one of his email, he advocated bombing of France. He also made statements that certain nations should be nuked and wiped out. On a preventive maintenance trip, he demanded to know why America was a super-power and India was not. I brought some of these incidents to Mr. James Bowks attention in a meeting between James Bowks, Jeffrey Hueston and me. During the meeting, Hueston continued using profanities and threw a shoe towards me in Mr. Bowks' presence. Mr. Bowks took no action.

(d) In United States, the term "Boys" was used by white masters for their Negro slaves in the past. In some Asian countries, the word "Boy" is used for someone who is much inferior in status or authority or for service providers and servants. In the military, this term is used by one with greater authority like a General for soldiers who have no authority. I believed that Mr. Hueston had no right to use that phrase because we were not in a relationship that would have justified the use of such a term. Also he was not my father who would call me "Boy" to show his affection. This phrase reminds me of the days when slavery was practiced in our country and people of one race were abused by people of another race.

F2-26

Initials ZMC

He was my co-worker with same position responsibilities as mine and enjoyed no authority over me.

**Q12.  Whom do you name as the management officials responsible for discriminating against you and why?**

A12.

(1) Brad A. Caldwell

As a telecommunication manager Caldwell discriminated against me by denying work compatible to my position description, denying promotion and equitable work.  Caldwell discriminated me by not providing OJT to me that was provided to all new comm. Specialists within two weeks after they joined ATF

As a branch chief, he allowed discriminatory treatment to continue and defended actions of both telecommunication managers, when I sought his assistance to seek resolution. In December 2000, Caldwell and Bowks held me in Caldwell's office and verbally accused me of office He acted as a rubber stamp on all actions that were initiated by the two communication managers. He discriminated against me when he hired a person from outside to a position for which I was most qualified. He even didn't offer me an opportunity to interview for that position.

(b) Samuel L. Ford

Ford started discriminating me for promotion and equal opportunities after he assumed his position in ATF. He assigned me tasks that were incompatible with my job responsibilities and position description. He denied me training opportunities and falsely told me that the requested training was not necessary, whereas after two weeks, he and all other telecommunications specialists except me received same training in Raleigh, N.C. He criticized my performance in public during staff meeting.

F2-27

Initials _Ple_

He breached PIP confidentiality by sharing to others that I was in PIP status.

Ford willfully discriminated against me when he refused to go with me to my field division for office visits. During the entire 2002-2003 periods, he never made a trip to my FD or any of my FOs. He never went to sites that I installed. He gave conflicting information and instructions and often held his inaccurate position because he said that he was the supervisor.

He gave me a defective radio for evaluation. The radio was not fixed during evaluation period. Yet he charged me for not evaluating that radio. He dumped most of radio shipping, packing, shipping and other non-technical responsibilities upon me for which I never received any credit.

(c) James Bowks

Mr. Bowks discriminated against me by setting arbitrary standards for my performance. He discriminated me by subjecting me to an unknown and unprecedented requirement of getting certified by another coworker in Atlanta.

James Bowks discriminated me by denying work assignments commensurate with my position responsibilities and position description. Instead of assigning me a field division to support like everyone else, he kept me in RCB and required me to do menial shipping, receiving, packing and data entry tasks. These assignments were not part of critical elements of my position. As a result, I ended up doing discredited work with no advancement opportunities.

In 2000, RCB transferred LMR responsibilities of Houston Field Division. I traveled to various Field offices to perform needed preventative maintenance and work on LMR equipment. My work was very much appreciated by the Houston FD personnel. In January 2001, James Bowks and Brad Caldwell took away those responsibilities from me and Bowks

F2-28

Initials

put me in a remedial training for a period of three months. The remedial training was a punitive action for a discussion between me and another coworker on better working strategies and solution to a problem. Mr. Bowks rebuked me in his office for over an hour for holding technical discussion with Mike Butkiss. On the other hand, he didn't rebuke Mike Butkiss for holding discussions with me although Butkiss also reported to him.

I invited Bowks attention to the fact that most of my assigned responsibilities were menial and clerical in nature and requested a meeting with him. Instead of holding a meeting, he said that I needed to be certified and had to travel to Atlanta. This was a clear example of discrimination because no other communication specialist had been required to go through certification process after performing at full potential. I had same responsibilities as other coworkers almost all of them were promoted to GS-13 except me.

(2) Brad A. Caldwell

As a telecommunication manager Caldwell discriminated against me by denying work compatible to my position description, denying promotion and equitable work. Caldwell discriminated me by not providing OJT to me that was provided to all new comm. Specialists within two weeks after they joined ATF

As a branch chief, he allowed discriminatory treatment to continue and defended actions of both telecommunication managers, when I sought his assistance to seek resolution. In December 2000, Caldwell and Bowks held me in Caldwell's office and verbally accused me of office He acted as a rubber stamp on all actions that were initiated by the two communication managers. He discriminated against me when he hired a person from outside to a position for which I was most qualified. He even didn't offer me an opportunity to interview for that position.

F2-29

(b) Samuel L. Ford

Ford started discriminating me for promotion and equal opportunities after he assumed his position in ATF. He assigned me tasks that were incompatible with my job responsibilities and position description. He denied me training opportunities and falsely told me that the requested training was not necessary, whereas after two weeks, he and all other telecommunications specialists except me received same training in Raleigh, N.C. He criticized my performance in public during staff meeting. He breached PIP confidentiality by sharing to others that I was in PIP status.

Ford willfully discriminated against me when he refused to go with me to my field division for office visits. During the entire 2002-2003 periods, he never made a trip to my FD or any of my FOs. He never went to sites that I installed. He gave conflicting information and instructions and often held his inaccurate position because he said that he was the supervisor.

He gave me a defective radio for evaluation. The radio was not fixed during evaluation period. Yet he charged me for not evaluating that radio. He dumped most of radio shipping, packing, shipping and other non-technical responsibilities upon me for which I never received any credit.

(c) James Bowks

Mr. Bowks discriminated against me by setting arbitrary standards for my performance. He discriminated me by subjecting me to an unknown and unprecedented requirement of getting certified by another coworker in Atlanta.

James Bowks discriminated me by denying work assignments commensurate with my position responsibilities and position description. Instead of assigning me a field division to support like everyone else, he kept me in RCB and required me to do menial shipping, receiving, packing

and data entry tasks. These assignments were not part of critical elements of my position. As a result, I ended up doing discredited work with no advancement opportunities.

In 2000, RCB transferred LMR responsibilities of Houston Field Division. I traveled to various Field offices to perform needed preventative maintenance and work on LMR equipment. My work was very much appreciated by the Houston FD personnel. In January 2001, James Bowks and Brad Caldwell took away those responsibilities from me and Bowks put me in a remedial training for a period of three months. The remedial training was a punitive action for a discussion between me and another coworker on better working strategies and solution to a problem. Mr. Bowks rebuked me in his office for over an hour for holding technical discussion with Mike Butkiss.  On the other hand, he didn't rebuke Mike Butkiss for holding discussions with me although Butkiss also reported to him.

I invited Bowks attention to the fact that most of my assigned responsibilities were menial and clerical in nature and requested a meeting with him. Instead of holding a meeting, he said that I needed to be certified and had to travel to Atlanta. This was a clear example of discrimination because no other communication specialist had been required to go through certification process after performing at full potential. I had same responsibilities as other coworkers almost all of them were promoted to GS-13 except me.

## Why did I name the above?

I have suffered a consistent pattern of discrimination in terms of promotion and job responsibilities. Following is a list of telecommunication specialists and their racial background that were with Radio Branch when I started working with ATF.

| Name | Race |
|------|------|
| Theodore Antonsen | White |
| James Bowks | Black |
| Michael Butkiss | White |
| Edward Cartossa | White |
| Jon Cummings | White |
| Michael Donahue | White |
| Jeffrey Hueston | White |
| Leslie Kenney | White |
| Sherwood Luther | White |
| Jeffrey Puckett | White |
| Michael Schmidt | White |

In 1999, I applied for promotion to GS-13 along with other communication specialists. I do not believe that James Bowks and Jeffrey Hueston applied. I was the only Asian telecommunication specialist in the Radio Communications Branch. I applied based on the merits of my educational background. No interviews were held for selection. Radio Branch promoted Michael Donahue, Edward Cartossa, Jon Cummings, Sherwood Luther, Jeffrey Puckett and Michael Schmidt. The selected officials were all white and non-Muslim.

A few months later, Radio Communication Branch promoted the following RCB communication specialists to GS-13. I was not promoted.

Michael Donahue and Theodore Antonsen. James Bowks and Jeffrey Hueston also promoted to GS-13 non-competitively. James Bowks was

F2-32

Initials

promoted as Telecommunications Manager. I think Leslie Kenney was not promoted to GS-13 nor did I.

A few months later, RCB hired following new communication specialists.

| Name | Race |
| --- | --- |
| John Harazda | White |
| Robert Jenkins | White |
| Roger Peterson | White |

RCB promoted Roger Peterson from GS-12 to 13. Robert Jenkins and John Harazda were promoted from GS-11 to GS-12 and then GS-13 non-competitively. Roger Peterson resigned a few years later. I applied for promotion and was interviewed. However, I was not selected.

In 1999 or 2000, RCB joined Pay Demo project. As a result, all GS-13 became PD-3 and GS-12 became PD-2.

A few years later, RCB hired another two communication specialists. I believe they were hired at PD-3 grade.

| Name | Race |
| --- | --- |
| Rafael Puente | Hispanic |
| Edward Skalniak | White |

Mr. Ford asked me to train both individuals in some technical matters.

**Q13.  What remedy do you seek in your complaint?**

A13.

I am seeking following remedies including but not limited to the following;

Retroactive promotion to telecommunications manager position at PD-3 (GS-13) level with back pay.

Reimbursement of attorneys' fees and other legal expenses and

Punitive damages for discrimination and compensation for mental anguish, pain and sufferings as allowed by law.

Other compensations as allowed by the law.

**Q14.  (a) Is there anyone you would like to suggest as a witness for the investigator to interview on the above issues?  (b) If yes, please provide the person's name and explain why he or she should be interviewed.**

A14.

Samuel Ford placed me on PIP. As a telecommunication specialist for Baltimore FD, I had similar job responsibilities as those of other telecommunications specialists in RCB.  Major responsibilities of the position require providing technical solutions to the division and individual field agents who use LMR resources. It included planning and supporting CIMRT law enforcement operations, coordinating and implementing relocation of LMR equipment and infrastructure during office relocation, addressing LMR concerns of individual field agents who may have defective radios or may need training in their use. My responsibilities also included conducting surveys for location of new LMR sites. This required contact with the state and local law enforcement authorities to discuss ATF needs and to determine if ATF radio equipment could be installed at their location to enhance radio coverage. My job responsibilities also included scheduling with individuals or groups in ATF division and field

offices to conduct preventive maintenance of their portable and mobile radios and fixed infrastructure.

Mine is basically a customer-oriented position where individual special agents called me to notify their technical problems and seek technical assistance. In most cases, I traveled to their locations to meet and assist them. Other telecommunications specialists have compatible job responsibilities and do the same that I did in commission of my duties as providing support to customers was a critical performance factor. I was treated differently than other communication specialists because I received no credit for such support unlike my counterparts who did. These special agents can provide a credible witness in terms of quality and timeliness of technical support that I provided, and determination if PIP was really warranted and justified. In the interest of fairness, I urge that my customers should be interrogated.

Telecommunication specialists assist one another during maintenance trips, office relocations, digital conversions of their divisions, and radio reprogramming etc. Because all specialists have same position description and job responsibilities as mine, they are in a better position to observe technical expertise and quality of technical help they receive from others. Many counterparts requested my technical assistance. Naturally, those communication specialists would be credible witnesses to determine technical quality of my assistance and whether a PIP was justified. In the interest of fairness, I urge that communication specialists should be added to the list of witnesses.

Performance should be measured based upon the position description and job responsibilities. Performance evaluation should be determined based upon an individual's accomplishments during entire year. My supervisor treated me differently than my counterparts in writing of my 2002-03-performance evaluation. He did not take any of my accomplishments into consideration.

My supervisor treated me differently than other communication specialists. He conducted office visits to meet and visit field divisions of other communication

Initials _ZHL_