# EXHIBIT 8

**Deposition of Zafar A. Khan**

```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLUMBIA

 3

 4   - - - - - - - - - - - - - - x

 5   ZAFAR AHMED KHAN               :

 6        Plaintiff,               :

 7        v.                       :   Case No: 1:05-CV-1831

 8   ROBERTO GONZALES,             :

 9        Defendant                :

10   - - - - - - - - - - - - - - x

11

12                                    Washington, D.C.

13                                    November 20, 2007

14

15

16   Whereupon,

17                     ZAFAR AHMED KHAN

18   the Witness, called for examination by Counsel for the

19   Defendant, pursuant to notice and agreement of counsel as to

20   time and place, at 501 3rd Street, NW, 4th Floor, Washington,

21   D.C., where were present on behalf of the parties:

22

23

24

25
```

2

```
 1  APPEARANCES:

 2              On Behalf of the Plaintiff:

 3              MICHAEL W. BEASLEY, Esquire

 4              200 PARK AVENUE

 5              SUITE 106

 6              FALLS CHURCH, VA 22046

 7

 8              On Behalf of the United States:

 9              SHEREASE PRATT, Esquire

10              501 3rd Street, NW

11              Washington, DC  20530

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      Q.    During that first year, did you continue to feel
2  good about working for Mr. Crook and Mr. Caldwell?
3      A.    Yes.
4      Q.    Did you have regular performance review discussions?
5      A.    I'm sorry?
6      Q.    Did you have regular performance review discussions?
7      A.    I guess it happened twice only during mid-year and
8  at the end of the year.
9      Q.    Were you satisfied with the feedback you received on
10 your --
11     A.    Yes, I was.
12     Q.    And then there came a time when you began to work
13 for someone else?
14     A.    Yes.   Then came a time when I started working for
15 Mr. James N. Bowks.
16     Q.    Do you remember the date?
17     A.    Must have been in 1999 through 2001.
18     Q.    Do you remember the month?
19     A.    No, I don't.
20     Q.    So Bowks was your first-level supervisor?
21     A.    Mr. Bowks was first-level supervisor.
22     Q.    And your second-level supervisor?
23     A.    Second-level was Mr. Caldwell.
24     Q.    How did you feel about working for Mr. Bowks and
25 Mr. Caldwell your second year at ATF?

```
1      A.    I had no problem.

2      Q.    Were you given regular performance reviews?

3      A.    Not too regular.  Like, twice a year.

4      Q.    Were you satisfied with your performance ratings?

5      A.    Yes, I was.

6      Q.    Do you recall what your performance ratings were?

7      A.    Well, the performance ratings were fully successful.

8      Q.    And then did there come a time when you worked for

9    someone else or when your relationship with Mr. Bowks changed?

10      A.    Well, the relationship with Mr. Bowks changed in

11   October of 2001 when Mr. Ford became my first-level

12   supervisor.

13      Q.    And what happened then?

14      A.    I came to work for Mr. Ford until end of 2003.

15      Q.    What was your relationship like with Mr. Ford and

16   Mr. Bowks during this time period from October 2001 to the end

17   of 2003?

18      A.    Mr. Ford was my first-level supervisor, and

19   Mr. Bowks was one of the other managers.

20      Q.    Did you have a good relationship with Mr. Ford --

21      A.    Oh, I had a professional relationship with Mr. Ford.

22      Q.    Did you still feel good about coming to work during

23   that time?

24      A.    Well, would you elaborate?  Coming to work in what

25   respect?
```

29

1  PIP.

2      Q.    How were your relationships with your co-workers

3  during this time?

4      A.    They were professional, very cordial relations.

5      Q.    Did you feel like you still wanted to be at ATF?

6      A.    Did I feel that I want to be at ATF?

7      Q.    Yes.

8      A.    Yes, I did.

9      Q.    How long was the PIP supposed to last?

10      A.    Counsel, the PIP was initially for 90 days; I guess

11  through September 20th of 2003.

12      Q.    And how long did it last?

13      A.    There was an extension granted for three weeks, so

14  it ended on October 17th of 2003.

15      Q.    Were you in the office the whole time while the PIP

16  was ongoing?

17      A.    Well, it depended, you know?  There were times --

18  excuse me -- when I had to work field technical support

19  functions or take preventive maintenance trips, but rest of

20  time I was in the office.

21      Q.    Did there come a time when you had to take sick

22  leave?

23      A.    Yes, there was time when I took sick leave.

24      Q.    Was this during the PIP?

25      A.    That was during the PIP, yes.

30

1    Q.    Do you remember how many days?

2    A.    I don't recall the exact number of days.  Must have

3 been few days.  I don't remember the exact number of days.

4    Q.    More than a week?

5    A.    Probably less than a week.

6    Q.    Were you out of the office for any other reason

7 during the PIP?

8    A.    I was suspended for seven days, from September 15th

9 through September 22nd of 2003.

10    Q.    For how many days?

11    A.    For seven days.

12    Q.    Did the time out of the office for the sick leave

13 and the suspension cause you to be in the office fewer days to

14 work on the PIP?

15    A.    That's right.

16    Q.    And did there come a time when the PIP was extended?

17    A.    The PIP was extended by three weeks.

18    Q.    Do you know why it was extended?

19    A.    I believe that it was extended to make up the lost

20 time.

21    Q.    Did it provide you with additional time to meet the

22 requirements of the PIP, the extension?

23    A.    Well, they gave me an extension of perhaps three

24 weeks to complete the paper.

25    Q.    And do you feel like that was a sufficient amount of

31

1    time to extend?

2        A.    That -- the time lost to sick leave and suspension.

3        Q.    And do you feel that anyone retaliated against you

4    when they extended the PIP?

5        A.    It was a retaliation from -- onset of PIP, the

6    retaliation for an earlier protected EEO complaint for -- I

7    had a discussion with a counselor earlier, in February of

8    2002.  And that's when the PIP started, and I attribute that

9    retaliation towards a legally protected EEO activity.

10       Q.    So you believe the PIP was a retaliation for seeking

11   EEO counsel?

12       A.    That was a retaliation for seeking EEO counseling

13   and EEO advice from the counselor.

14       Q.    But I understand you're saying that you don't

15   believe the extension of the PIP was retaliation?  It was the

16   PIP itself?

17       A.    The extension of the PIP was to make up for the time

18   lost for the three -- for the time lost to sick leave and the

19   suspension.

20       Q.    How did you view the PIP?

21       A.    The PIP was a retaliation.  There was no reason for

22   placing me on PIP whatsoever.  My performance was excellent in

23   the field.

24       Q.    So you said that you had a discussion with the EEO

25   counselor in 2002?

1    Q.    Mr. Khan?

2    A.    Yes, ma'am?

3    Q.    Before we left for the break, we were discussing

4 about how you felt that some of your colleagues were promoted

5 past you.  So did there come a time when you noticed there

6 were some vacancies at a higher level than the level you held?

7    A.    Yes, there were [sic] a time when I noticed that

8 there were vacancies at a higher, and that occurred in year

9 2000 and I believe in 2001.

10    Q.    Did you seek advice from anyone at that time about

11 being promoted?

12    A.    Did I seek advice from anybody?  And the answer

13 would be, no, I did not seek advice because I felt that I was

14 promotable, that my performance was superior and at par with

15 other co-workers.  You know, back then, my earlier supervisor

16 had put me on remedial training, and that was something very

17 undeserving.  You know, I was supporting Houston, Texas,

18 Houston Field Division, independently of my supervisor.  In

19 same time frame, I supported com inspect list in digital

20 conversion of New York Field Division.  So the remedial

21 training was uncalled for.

22        I did not feel very good about the remedial

23 training.  It was demeaning because of my performance at a

24 superior level, and then all of the sudden, he stopped me from

25 supporting Houston Field Division in 2001.  And my remedial

38

1  training was a public knowledge.  People would question me why

2  I was subjected to the remedial training.  During the remedial

3  training, I was asked for technical support from my

4  co-workers, but I was denied the opportunity to go in the

5  field and support those people.

6      Q.    Did you -- did anyone tell you why you were being

7  put on remedial training?

8      A.    There was no explanation whatsoever.  The remedial

9  training was at the whim of the supervisor.

10     Q.    And which supervisor was that?

11     A.    It was James Bowks.  And the reason was, he was in a

12 position -- he had authority over me.

13     Q.    This was in 2001?

14     A.    That was in 2001.

15     Q.    Okay.  But going back to 1999 when you said that you

16 felt like some of your colleagues were starting to be promoted

17 ahead of you, so you said you didn't seek advice from anyone

18 about getting promoted?

19     A.    I did not seek advice.  I believe that my

20 performance was at par with the promotees and I should have

21 been promoted.

22     Q.    So did you have any discussions with anyone about

23 being promoted at ATF?

24     A.    I spoke to my supervisor, James Bowks, about a

25 promotion.

108

1    Q.   Okay.  Do you feel you were proficient on the items

2    listed on the PIP?

3    A.   You have to speak a little bit louder, ma'am.

4    Q.   Oh, sure.  Do you feel that you were proficient on

5    the items listed on the PIP?

6    A.   Yes, very proficient on the items.

7    Q.   So you would want your supervisor to observe your

8    ability to --

9    A.   Certainly.

10    Q.   Okay.

11    A.   That was whole intent of the PIP, for me to

12    demonstrate to him that I can carry on those functions on the

13    PIP.

14    Q.   Okay.  Thank you.

15    A.   Um-hum.

16    Q.   Did there come a time when the use of your

17    home-to-work driving privileges were suspended?

18    A.   My home-to-work, work-to-home driving privileges

19    were suspended on or around September 23rd time frame.

20    Q.   Did something happen to cause your home-to-work

21    privileges to be suspended?

22    A.   Well, the reason that Mr. Ford cited for the

23    suspension was that I was no longer required to provide

24    support to the Baltimore Field Division.

25    Q.   That was the reason you were -- your home-to-work

1    privileges were suspended?

2          A.    Yes.

3          Q.    Because?

4          A.    Because Mr. Bowks felt that I would not be required

5    to provide any field support to Baltimore Field Division.

6          Q.    Was it only your home-to-work privileges that were

7    suspended?  Were you still able to drive the vehicle other

8    times?

9          A.    No, I wasn't able to drive the vehicle.

10         Q.    And was there some letter or e-mail sent to you?

11   How did you come to believe that you were not able to drive

12   the vehicle?

13         A.    There was an e-mail, I believe, from Mr. Ford,

14   indicating that the vehicle was being taken away.

15         Q.    Did you have any other need or use for the vehicle?

16         A.    Definitely.  The need that I had was in the

17   commission of providing technical support to Baltimore Field

18   Division.  I --

19         Q.    Well, once those responsibilities were removed,

20   though, did you have any further need for the vehicle?

21         A.    In that case, there was no reason for me to continue

22   driving that vehicle.

23         Q.    Did you continue to use a vehicle for business

24   matters?

25         A.    The government vehicle?

132

1    A.    I was suspended, yes.

2    Q.    So you were not under an obligation to check your

3    e-mails when you were suspended?

4    A.    Well, I would check my e-mail more frequently than

5    the phone calls.

6    Q.    So Mr. Ford left a message with your wife asking

7    that you change your e-mail?

8    A.    Mr. Ford called and my wife -- received the phone

9    call, and she gave it to me, and she was obviously not too

10   pleased.    Anyway, I did speak with Mr. Ford and got his

11   message.

12   Q.    What time did he call you?

13   A.    I think it was around 5:30 or 5:45 p.m. that day.

14   Q.    Did you change your message?

15   A.    Yes, I removed the message.

16   Q.    When did you change it?

17   A.    I don't remember, counsel.

18   Q.    Was it the same day?

19   A.    Yeah, I changed it the same day, but I don't

20   remember the contents of the e-mail.

21   Q.    Ultimately, did you resign from ATF?

22   A.    Yes, counsel, I did.

23   Q.    And why did you resign?

24   A.    I resigned because I would have been terminated had

25   I not --