**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ZAFAR H. KHAN** ) | |
| ) | |
| **Plaintiff** ) | **Civ. No. 05-1831 (TFH)** |
| **v.** ) | |
| ) | |
| ) | |
| **ERIC HOLDER** ) | |
| **as United States Attorney General,** ) | |
| ) | |
| **Defendant.** ) | |

### Memorandum Opinion

Plaintiff Zafar H. Khan filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981, et seq., the Civil Rights Attorney's Award Act, as amended, 42 U.S.C. § 1988, et seq., and 29 C.F.R. § 1614 et seq., alleging discrimination based upon race, color, religion, national origin, and retaliation. Pending before the Court is defendant's Motion for Summary Judgment. The Court has carefully reviewed the defendant's motion, plaintiff's opposition thereto, defendant's reply, and the entire record of this case. The plaintiff has not produced sufficient evidence for a reasonable jury to find that defendant's asserted legitimate explanation was not the real reason for the adverse employment actions it took against plaintiff and that defendant had actually discriminated against plaintiff on the basis of his race, color, religion, or national origin or that defendant retaliated against for engaging in a protected activity. Therefore, the Court will grant defendant's motion for summary judgment.

## I.    Background

Plaintiff, Zafar A. Khan, was employed by the Bureau of Alcohol, Tobacco, and Firearms ("ATF" or "defendant") as a Telecommunications Specialist, PD-391-2 in the Radio Communications Branch of the Technical Services Division, Office of Science and Technology from July 1998 until April 2004.  Plaintiff was responsible for providing technical support and assistance to ATF Field Divisions.  Pl. Ex. 2, Khan Aff., at 2.   Plaintiff alleges that he was systematically discriminated against based on his race (South Asian), nationality (Indian/Pakistani) his religion (Muslim), and retaliated against for complaining about the discrimination to the ATF's Equal Employment Office ("EEO").  According to plaintiff, the discrimination and retaliation culminated in a Decision to Remove for Unsatisfactory Performance issued on April 7, 2004.

From July of 1998 to November of 1999, plaintiff's immediate supervisor was Telecommunications Manager Brad Caldwell.  In November of 1999, Caldwell was promoted to Telecommunications Branch Chief and became plaintiff's second line supervisor. Def. Facts ¶ 9.  Caldwell was Plaintiff's second-line supervisor for the rest of plaintiff's employment at ATF.  James Bowks, who had formerly been plaintiff's coworker, was promoted to Telecommunications Manager.  Bowks was plaintiff's immediate supervisor until October 2001, when Sam Ford was promoted and became plaintiff's supervisor.  Def. Facts ¶ 9.  Plaintiff's third line supervisor for the entirety of his employment was Chief of ATF's Technical Services Division Timothy McGinnis.

At the beginning of plaintiff's employment at ATF, plaintiff and other employees in his position were reviewed on five critical elements: Technical Proficiency; Technical Responsibilities; Interpersonal Skills; Professionalism; and Effective Communication.  *See* Pl. Ex. 3, Nov. 5, 1998

Performance Appraisal; Pl. Ex. 4, Feb. 25, 2000 Performance Appraisal. Each element is graded O (Outstanding); EFS (exceeds fully satisfactory); FS (fully satisfactory); LFS (Less than fully satisfactory); or U (unsatisfactory). *See* Pl. Ex. 3 at 1. Employees also received an overall rating based on the average of the grade for each of the elements. However, if an employee receives an LFS or U rating in any element, he or she will automatically receive either an LFS or U rating overall. *Id*.

In Khan's first evaluation, covering the period of July 5, 1998 to October 31 1998, Plaintiff's then-supervisor Brad Caldwell gave plaintiff FS ratings for each critical element and an overall FS rating. Pl. Ex. 3 at 1. However, plaintiff could not be evaluated on all the listed criteria for each element because he was still in training. *Id*. In his second evaluation, covering the period from November 1, 1998 to October 31, 1999 and signed by Caldwell on February 25, 2000, Khan received a grade of EFS on Interpersonal Skills and Effective Communication, and an FS on Technical Proficiency, Technical Responsibilities, and Professionalism. Def. Ex. 4 at 1. His overall grade was FS. *Id*. Though the comments in the review were generally positive, Caldwell did note that Khan "requires repetition and reinforcement of the training he has received to gain the level of technical expertise required to become self-sufficient as a telecommunications specialist," *id*. at 2, and noted that Caldwell had conducted "[s]everal discussions" with plaintiff regarding plaintiff's responsibility to "achiev[e] the knowledge required to become a fully qualified and self-sufficient communications specialist." *Id*. at 5.

The ATF changed its rating system in 2000. For each critical element, employees were rated E (Performance Exceeds Expectations); A (Performance Achieves Expectations); or B (Performance Below Expectations). Based on their performance in each critical element, employees received an

overall rating of Outstanding (all elements rated E), Exceeds Objectives (majority of elements rated E and others rated A), or Meets Expectations (less than half of elements rated E, the rest A). *See* Pl. Ex. 5, Oct. 27, 2000 Performance Appraisal, at 7. However, if an employee is rated Below Expectations in any critical element, the "supervisor must decide and explain" whether the performance should be rated "Needs Improvement" or "Unsatisfactory." *Id.*

For the review periods June through September 2000 and June through September 2001, Bowks gave plaintiff an overall "Meets Expectations" review with favorable comments. Pl. Ex. 5; Pl. Ex. 6, Dec. 26, 2001 Performance Appraisal. However, in 2001, plaintiff alleges that individuals at the agency, particularly Bowks, were discriminating against him based on his race and religion. Plaintiff alleges that he was given menial tasks that were more suitable for a shipping clerk than for someone with his technical expertise. In early 2001, Bowks took away plaintiff's responsibilities to service the Houston Field Division and put him in remedial training, allegedly without justification. Following the attacks of September 11, 2001, plaintiff alleges that Bowks told plaintiff that he could not provide technical support at the Pentagon or in New York City because Bowks considered Plaintiff to be a "security risk" due to the fact that plaintiff was a Muslim. *See* Pl. Opp. at 30; Pl. Ex. 10, Dep. of Z. Khan, 42:8-21, Plaintiff also alleges that Bowks stated that American Muslims should be "put in quarantine like Japanese Americans and their civil liberties should be terminated." *Id.* at 43:6-12. Plaintiff also alleges that others at ATF sent him and each other emails portraying Muslims as terrorists.

In October of 2001, Sam Ford became plaintiff's supervisor. Plaintiff stated that he continued to feel that he was being passed up for promotions and was being assigned menial tasks because of

his race and religion. Def. Ex. 1, Khan Aff., at 8.  In March of 2002, plaintiff complained to the ATF's EEO that he was being denied training and promotion opportunities as a result of his race and religion. *Id*. at 5.  Ford was told of plaintiff's complaint and discussed the issue with plaintiff and an EEO counselor. Def. Ex. 20, Ford Aff., at 3.  Plaintiff states that Ford discouraged him from filing a formal complaint. Def. Ex. 2 at 5.  Plaintiff states that this is where his trouble with Ford began, asserting that following the informal complaint, "Supervisor Ford then commenced a relentless and vicious attack against Plaintiff Khan in an ongoing program of unlawful discrimination based upon Plaintiff's race, national origin and religion, and as unlawful retaliation for Plaintiff Khan's protected EEO activities which began in March 2002." Pl. Opp. 19-20.

For the review period October 2001 to November 2002, Ford gave plaintiff an overall rating of "Meets Expectations" and gave him a grade of A ("Performance Achieves Expectations") in each of the critical elements. Pl. Ex. 7.  These grades were comparable to plaintiff's previous evaluation. However, while the comments were generally positive, Ford did identify some areas of improvement, noting that Khan "required supervisory intervention" and that he needed "occasional prompting to complete assignments" on several occasions. *Id*. at 5, 7.  On October 1, 2002, plaintiff was assigned to provide support to the Baltimore Field Division. Ford and Brad Caldwell, plaintiff's second line supervisor, both stated that they received complaints from individuals in the Baltimore Division about plaintiff's ability to perform the technical services that were required of him. *See* Def. Ex. 12, S. Ford. Dep., at 161:16; Def. Ex. 14, B. Caldwell Dep., at 101:14-102:18.  According to Ford, plaintiff's performance continued to deteriorate between October 2002 and January 2003 and he

"failed to complete several assignments given to [plaintiff] by [plaintiff's] supervisor." Def. Ex. 13, Memorandum re: Opportunity to Improve Performance, at 2.

In March of 2003, Ford informed Plaintiff that he was giving a plaintiff a mid-year review with an overall grade of "Unsatisfactory." Def. Ex. 22, Dec. 10, 2003 Performance Appraisal. In December of 2003, plaintiff's "Unsatisfactory" grade became official for the November 2002 to October 2003 reporting period. *Id*. The review stated that plaintiff was performing below expectations in four out of the five critical elements, and cited specific examples of plaintiff's failure to meet expectations. *Id.* For noted that Khan continued to require a great deal of supervision, and had "difficulty identifying and resolving problems with the equipment without requiring a great deal of outside technical assistance." *Id*. at 3. Ford noted that plaintiff was unable to complete tasks without supervision and help, though other employees of plaintiff's grade and experience were able to do so independently. *Id*. Ford noted that plaintiff "rarely submitted required trip reports and/or technical reports on time and the reports that were submitted lacked content." *Id.* at 10.

On June 20, 2003, Ford put plaintiff on an Performance Improvement Plan ("PIP"). In a memorandum explaining the decision, Ford told plaintiff that the PIP was a "90-day opportunity period to improve your performance." Def. Ex. 13 at 2. Ford observed that plaintiff was consistently unable to complete projects that required troubleshooting techniques and technical skills, that he frequently required assistance from other technicians to do his job, and that, despite receiving formal and informal training, he lacked the technical knowledge of equipment and procedures required by his position. *Id*. at 2. Ford found Khan's technical expertise to be below expectations, noting that plaintiff's deficient performance jeopardized the effectiveness of agency missions, exposed agency

equipment to possible damage or destruction, and risked the safety and well-being of agency personnel. *Id.* at 3. According to the performance improvement memorandum, plaintiff was unable to independently complete routine equipment installations, even when the agency provided plaintiff with step-by-step, written instructions. *Id.* In October 2002, plaintiff was tasked with preparing a repeater site for the agency's Baltimore Field Division. Plaintiff could not complete the assignment and required "constant supervision." *Id.* Even with supervision, it took plaintiff over two months to finally begin the project, and once he did, he was unable to perform the required technical work without assistance from others. *Id.* at 3-4.

According to Ford, plaintiff also failed to project the professional demeanor and positive attitude required by his position. *Id.* at 7. Plaintiff's performance in this critical element was so deficient that the supervisor deemed Plaintiff "neither reliable nor dependable," and observed that Plaintiff failed "to adequately manage time, funds, or other resources." *Id.* As part of his job responsibilities, Plaintiff was required to prepare written reports summarizing the activities he performed while working in the field; he usually failed to file these reports. *Id.* at 8. Moreover, even when Plaintiff did submit them, he often failed to include all required information. *Id.* Compounding Plaintiff's struggles with this critical element, his supervisor observed that Plaintiff lacked the ability to describe and define projects in technical terms and using technical references. *Id.*

On June 18, 2003, plaintiff's second line supervisor, Timothy McGinnis, issued a plaintiff a "Notice of Proposal to Suspend for Seven (7) Calendar Days" because McGinnis had determined that plaintiff had provided false statements to a law enforcement officer and failed to report an incident involving a government furnished automobile ("GOV"). Def. Ex. 15 at 1. An ATF Office of

Inspection investigation found that on June 26, 2002, plaintiff had been ticketed for driving alone in the GOV in a High Occupancy Vehicle ("HOV") lane on the Dulles Access Road. *Id.* According to the officer who pulled Khan over, plaintiff told the officer that plaintiff was on official business for ATF at the time of the incident. *Id.* at 18. However, Khan told ATF investigators that he was actually on his way home. *Id.*

Plaintiff objected to the Notice of Proposal, citing several purportedly mitigating factors that he believed merited a less severe penalty than suspension. *Id.* at 12-14. Khan denied that he ever told the officer he was on the official business. *Id.* at 11. Khan also stated that he was on the Dulles Access Road because the "heavy rain, poor visibility, and bumper-to-bumper traffic" made him "afraid" that the he and the GOV were in danger. *Id.* at 12. Plaintiff stated that he did not know that "minor traffic citations warranted an immediate report to his first line supervisor." *Id.* at 13. In addition, plaintiff stated that because the vehicle's tag was improperly identified on the citation, plaintiff "expected to challenge the validity of the ticket based on technical merits and was hoping that the ticket dropped." *Id.* at 13. Because the ticket was on appeal, plaintiff "did not consider the ticket as evidence of guilt and did not report it to [his] supervisor." *Id.* Plaintiff also alleges that the officer was "irritated" that plaintiff appealed the ticket and "exerted undue pressure by calling [plaintiff] at home and asking [him] to have [his] appeal withdrawn." *Id.*

On September 4, 2003, McGinnis issued his final Decision to Suspend for Seven Days. Based upon the Office of Inspection's Report of Investigation, the notice of proposed suspension, plaintiff's written reply dated July 17, 2003 and his oral reply on July 18, 2003, McGinnis concluded that Plaintiff violated ATF Order 2130.1, Conduct and Accountability, section 17(a), by "lying to a law

enforcement officer in the course of an official inquiry." *Id*. at 19. McGinnis found that plaintiff further violated the ATF Order by failing to report the traffic violation to his supervisor. *Id*. McGinnis found that as an ATF employee with access to a GOV, plaintiff should have known that ATF policy requires an employee who operates a GOV to immediately report all incidents, tickets, and citations involving their assigned vehicle to a person in their supervisory chain of command, whether on or off duty. *Id*. at 1. The investigation resulted in plaintiff's suspension from work without pay from September 15-22, 2003.

On June 20, 2003, following his placement on the PIP, plaintiff contacted the EEO complaining that his allegedly menial work requirements, lack of promotions, and placement on the PIP were all a result of discrimination on the basis of race, religion, and national origin or retaliation for plaintiff's prior EEO complaint. *See* Def. Ex. 2. The complaint became final on September 17, 2003. *Id*. Plaintiff claims that his negative reviews were unfair because some of the reviews were based tasks that it was impossible for him to perform. Specifically, plaintiff alleges that Ford gave him a negative review because plaintiff did not evaluate a radio that was broken when plaintiff received it. *Id*. at 3-4. When the radio was replaced, "it came malfunctioning and without any literature." *Id*. at 4. Nevertheless, plaintiff alleges, Ford held Khan "responsible for not being able to evaluate the radio and write a report." *Id*.

Ford took copious notes regarding plaintiff's progress in the PIP, which were presented to plaintiff as part of the September 22, 2003 Memorandum Regarding the PIP Extension. Def. Ex. 17. These notes reflect a number of incidents where plaintiff behaved unprofessionally or failed to perform technical responsibilities that would be required of someone in his position. *See id*. While

plaintiff was on the PIP, he was relieved of his duties to service the Baltimore Field Division, and his home-to-work GOV privileges were temporarily suspended. *Id*. at 1. On September 22, 2003, the original 90-day PIP was also extended an additional twenty days. *See id*. According to the defendant, the agency took these actions so that plaintiff could have the best chance of succeeding in the PIP and to make up time plaintiff missed while he was on sick leave and on suspension for the GOV incident. However, plaintiff argues that the agency took these responsibilities away as part of a plan to isolate and discredit plaintiff and that Ford's description of plaintiff's work was false or unfair.

In December of 2003, Ford gave Khan a Proposed Removal Based on Unsatisfactory Performance, detailing the ways in which he believed Khan had failed to complete the PIP and was still performing below expectations. *See* Def. Ex. 18. According to Ford, plaintiff displayed repeated technical incompetence, and his inability to provide effective radio communications support could have resulted in serious damage to the equipment or impaired operations. While testing a Quantar repeater, plaintiff was "unaware of the [watt] input limitations on the [testing] equipment, nor did [plaintiff] know what possible damage might be caused by not observing the limitations." *Id*. at 90. As a result, "[plaintiff's] actions could have damaged this $20,000 piece of test equipment" or could have made it "give erroneous readings . . . and thus led the technician to misalign the radio under test or maintenance." *Id*. at 90. Ford noted that "an improperly programmed or aligned radio system . . . could jeopardize an enforcement operation or put an agent's life in danger if the agent is unable to communicate on the radio." *Id*. at 90.

Ford also noted that plaintiff displayed unprofessional conduct and was frequently unreliable. During weekly performance improvement plan (PIP) meetings with his supervisor, Khan "[was]

unable to recall what [he] had accomplished the previous week," such that his supervisor "relied heavily on [his own] weekly notes to refresh [plaintiff] on what had transpired." *Id*. at 92. Plaintiff turned in only two of four required reports evaluating specified products, one of which "did not provide [plaintiff's] recommendation," but rather "appeared . . . [to be] copied directly from the manufacturers specification sheets." *Id.* at 92-93. As a part of the PIP, Plaintiff attended a project management course at which "[he] failed to complete all of the assigned tasks and never explained why." *Id*. at 94. In addition, plaintiff "did not volunteer assistance to [his] fellow workers" and "on several occasions . . . [was] observed standing by watching while . . . fellow workers and managers were participating in a team effort to complete a task." *Id*. at 94.

Plaintiff was given the opportunity to appeal the Proposed Removal, and gave both written and oral rebuttals of Ford's account of his work. However, on April 7, 2004, plaintiff's third line supervisor Timothy McGinnis issued plaintiff a Decision to Remove for Unsatisfactory Performance. Def. Ex. 19. The document describes Ford's description of plaintiff's work, and considers each of plaintiff's purported explanations and rebuttals. *See id*. at 66 (discussing plaintiff's explanation of the broken radio incident). McGinnis concludes that plaintiff had been "given many opportunities to demonstrate an acceptable level of performance, but [plaintiff] did not do so." *Id.* at 64. On April 9, 2004, plaintiff submitted his letter of resignation "in an effort to avoid the adverse effects of a termination action." Pl. Facts ¶ 36.

On June 26, 2004, plaintiff filed an EEO complaint which was later consolidated with his previous complaint. Def. Ex. 3, June 26, 2004 Complaint of Discrimination. The June 2004 complaint reiterated the allegations of his previous complaints and claimed that the agency's decision

to terminate him was a result of discrimination and retaliation. *See id*. On August 16, 2005, the

Department of Justice denied all of plaintiff's claims, finding that plaintiff had not proffered any

evidence that showed defendant's explanations were pretextual and that retaliation or discrimination

were the true motives. Plaintiff then filed the instant suit, pleading one count of discrimination, one

count of retaliation, and one count of count of unlawful termination from government employment.

Compl. at 11-14.

## II.      Legal Standards

### A.  Summary Judgment

Defendant has moved for summary judgment under Federal Rule of Civil Procedure 56.

Under Rule 56, if the submissions to the Court demonstrate that there is no genuine issue as to any

material fact, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56. A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Calhoun v. Johnson*, 632 F.3d 1259 (D.C. Cir. 2011) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To succeed on its motion, the moving

party need not produce evidence to demonstrate the lack of material facts at issue, but may instead

merely point to the lack of evidence before the court to support the non-moving party's case. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In considering summary judgment, the Court must view all of the evidence in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). Furthermore, the D.C. Circuit has noted that because it is difficult to obtain proof in

discrimination cases beyond the mere testimony of the plaintiff, the Court should view summary

judgment motions in discrimination cases cautiously. *Aka v. Washington Hosp. Center*, 116 F.3d 876, 879-880 (D.C. Cir 1997).

Nevertheless, the non-moving party may not simply make conclusory allegations unsupported by specific evidence. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 902 (1990). "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purposes of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (failing to find sufficiently specific facts where plaintiff merely alleged that she was more qualified than others hired for the job).

### B. Failure to Exhaust Administrative Remedies

Under Title VII, a person must first pursue administrative relief before bringing an action in federal court. *Love v. Pullman Co.*, 404 U.S. 522, 523 (1972). According to 29 C.F.R. § 1614.105, any person aggrieved by an alleged act of discrimination on the basis of race, sex or age must consult with an EEO counselor in order to potentially resolve the matter informally. 29 C.F.R. § 1614.105(a). Furthermore, contact with the counselor must be made within 45 days of the alleged discriminatory conduct. 29 C.F.R. § 1614.105(a)(1).

Defendant cites the Supreme Court's decision in *National Railroad* to support the proposition that "*each* incident of discrimination and *each* retaliatory adverse employment decision 'constitutes a separate actionable unlawful employment practice,' for which a timely administrative complaint must be filed." Def. MSJ at 11 (emphasis in original) (quoting *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Consequently, defendant treats each alleged discriminatory or

retaliatory action plaintiff describes in his EEO complaints as individual causes of action. Defendant points out that many of the events that plaintiff described in his EEO complaints occurred more than forty-five days before plaintiff filed the respective complaints, including being placed in remedial training in 2001, lack of promotion in 1999 and 2000, the unfair evaluation by Sam Ford regarding the broken radio, and a January 2003 letter of reprimand. Def. Rep. at 3-6. The defendant contends that plaintiff "cannot raise the issues of denial of promotions, training opportunities and hostile work environment when he failed to exhaust those claims administratively." Def. Rep. at 5. Because plaintiff did not raise those issues at the time, defendant argues, "the Court should dismiss these claims." Def. MSJ at 12.

However, the Court does not read plaintiff's complaint as raising a separate "claim" as such with respect to each alleged negative event during the course of his employment. Instead, plaintiff is alleging that the defendant took "a series of individual acts constituting a means to an end"—that is, the defendant systematically gave plaintiff less training and worse reviews than he deserved in order to ultimately remove him from his employment. *See* Pl. Opp. at 11. The *National Railroad* Court made it clear that a plaintiff may use time-barred acts "as background evidence in support of a timely claim." *National Railroad*, 536 U.S. at 133. In addition, the exhaustion requirement does "not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id*. In this case, each incident described in plaintiff's EEO complaints, even if not actionable in and of itself, may be considered as evidence of defendant's alleged discrimination and/or retaliation, providing context for

the incidents that were the subject of timely EEO complaints.[1]  Therefore, the Court will not dismiss

any "claims" on the grounds of failure to exhaust administrative remedies.  *Cf. Park v. Howard*

*University*, 71 F.3d 904, 907 (D.C. Cir. 1995) (noting that "the administrative charge requirement

should not be construed to place a heavy technical burden on 'individuals untrained in negotiating

procedural labyrinths'" (quoting *Loe v. Heckler,* 768 F.2d 409, 417 (D.C.Cir.1985))).

### C.  Title VII

The plaintiff has alleged both unlawful discrimination and unlawful retaliation under Title

VII.  Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin." 42 U.S.C. § 2000e–2(a)(1).  To establish that the discharge was unlawful

discrimination, it is sufficient that "race [or] color . . . was a motivating factor for any employment

practice, even though other factors also motivated the practice." *Id*. § 2000e–2(m).  Title VII also

makes it unlawful to "discriminate against any of [its] employees ... because he has made a charge ...

or participated in any manner in an investigation" of discrimination. 42 U.S.C. § 2000e-3(a); *see*

*Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C.Cir.2006) ("general ban on retaliation in § 2000e-

3(a)" applies to federal employers through § 2000e-16).

---

[1] Defendant acknowledges that plaintiff timely filed administrative complaints with regard to at least two discrete actions—the June 2003 placement PIP and the April 7, 2004 Decision to Remove. Def. Rep. at 3.  Plaintiff also timely raised other incidents in his September 2003 EEO complaint, including allegedly being barred from training in 2003, Mr. Ford's continued refusal to allow him to maintain an office in close proximity to the Baltimore Field Office, and Mr. Ford's continued insistence that plaintiff perform menial tasks. Def. Ex. 2 at 6, 7, 8.

To succeed on a Title VII claim, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its personnel decision. *Id*. Should the defendant carry this burden of production, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons for their decision, but were merely a pretext for discrimination. *Id*. at 804. However, the Court of Appeals for this Circuit has found that "once the employer asserts a legitimate, non-discriminatory reason" for the challenged decision, "the question of whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C.Cir.2008) (alteration in original) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510, 511 (1993)). Therefore, when "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," a district court considering a motion for summary judgment

> must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race [or] color?

*Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (quoting *Brady*, 520 F.3d at 494). The framework articulated in *Brady* "appl[ies] equally to retaliation claims." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).[2]

In this case, the Court finds defendant has articulated a legitimate and non-discriminatory reason for taking the actions it did. Essentially, defendant states that the negative reviews of plaintiff's performance accurately reflected his work, and though plaintiff was given ample opportunity to improve, he did not do so. To determine whether the evidence is sufficient for the jury to find the employer's stated reason was not the actual reason for the adverse decision, the court may consider "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (citations omitted).

---

[2] Defendant argues that defendant has not established a prima facie case for discrimination or retaliation "with respect to his claims relating to delay and denial of training opportunities and the denial of technical certifications; the relief from certain professional responsibilities during the PIP; placement on the PIP; and extension of the PIP" because these events do not rise to the level of an "adverse employment action." Def. MSJ at 13, 14. Leaving aside the question of whether these incidents are properly classified as "claims" as opposed to evidence in support of claims, *see supra*, the Court need not spend time parsing out whether particular events qualify as "adverse" under Title VII. *See Brady*, 520 F.3d at 494 (noting that "the prima facie case is largely an unnecessary sideshow." (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983))). For the same reason, the Court need not rule on defendant's argument that the plaintiff's resignation was not a constructive discharge, *see* Def. MSJ 30-31.

### III. Analysis

#### A. Defendant's decision to place plaintiff on the PIP

##### 1. Plaintiff fails to show that defendant's explanation is unworthy of credence

A plaintiff may show pretext "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 71 (D.D.C. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "Evidence indicating that an employer misjudged an employee's . . . performance or qualifications" can be "relevant to the question whether its stated reason is a pretext." *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 26 (D.C. Cir. 2013) (quoting *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). For example, "if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." *Fischbach*, 86 F.3d at 1183.

However, the court "must not question the employer's . . . decision on the basis of qualifications, but instead, decide whether there is sufficient evidence of discrimination offered to show that the defendant's stated reason was a pretext." *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 115 (D.D.C. 2004) (citation omitted). Instead, "the issue is whether the *employer honestly and reasonably believed*" that the adverse action was the correct decision based on the facts. *Brady*, 520 F. 3d at 496 (emphasis in original). Plaintiff attempts to show that when his supervisor Sam Ford put him on the PIP, Ford did not reasonably believe that plaintiff was performing below expectations because 1) plaintiff was actually performing adequately and 2) Ford used the wrong criteria to evaluate the plaintiff. Neither argument has merit.

*Evidence that plaintiff was performing adequately is not evidence of pretext*: Plaintiff argues that the evidence shows that Ford "generated of thin air and documented in" the March 2003 negative review and the PIP notice "the totally false assertion that Plaintiff Khan was performing 'Below Expectations'" as part of a "mean-spirited" vendetta against the plaintiff. Pl. Opp. at 23, 27. According to plaintiff, Ford's "allegations" that plaintiff cannot perform critical job functions "have not only never been made against Plaintiff, but they have been thoroughly refuted over a number of years through numerous evaluations and observations of several former supervisors and a large group of co-workers and customers." Pl. Opp. at 24-25. To demonstrate that he was performing adequately, plaintiff first recounts the largely positive reviews he received from co-workers and supervisors between 1998 and 2001, Pl. Opp. at 12-16, and asserts that during the entire time he was employed by ATF, his performance "had never been less than the sterling results of prior years." *Id*. at 19.

A Court may find a proffered explanation unworthy of credence if a plaintiff can "demonstrate that the employer is making up or lying about the underlying facts that formed the predicate of the employment decision." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). But established law makes it clear that plaintiff's evidence purportedly demonstrating that he was in fact performing well is insufficient to show that his employer's stated reason is false. The fact that plaintiff may have met expectations in the past is irrelevant to the question of whether Ford believed that plaintiff was performing adequately when Ford placed plaintiff on the PIP. *See Luckie v. Ameritech Corp*., 389 F.3d 708, 715 (7th Cir. 2004) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir.2002)) (noting that "the fact that [plaintiff] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of

her termination."). In addition, plaintiff's own assessment that his work continued to be "sterling" is immaterial. Only "the perception of the decisionmaker" matters; plaintiff's perception of his own work performance is not relevant. *Beyah v. Dodaro*, 666 F. Supp. 2d 24, 35 (D.D.C. 2009) (quoting *Smith v. Chamber of Commerce of the United States*, 645 F.Supp. 604, 608 (D.D.C. 1986)).

Plaintiff also argues that Ford's account of plaintiff's deficiencies in the PIP notice and March 2003 performance review were "directly and comprehensively rebutted" by other ATF employees. Pl. Opp. at 27. According to plaintiff, prior to the Unsatisfactory review in 2003, "the *only negative comments* regarding Plaintiff Khan were those rendered by Supervisor Ford in his Performance Appraisal comments rendered in December 18, 2002." *Id*. (emphasis in original). To show that Ford deliberately refused to credit plaintiff's good work, plaintiff cites the comments of several of his coworkers at ATF attached to the final December 2003 performance review, including an evaluation by Stephen Taylor, plaintiff's main contact in the Baltimore Field Office. Pl. Ex. 15 at 12. The opinions of others at the ATF would only be relevant if they showed that Ford was lying and did not reasonably believe his assessment of plaintiff's work. *See Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 115 (D.D.C. 2004) (citation omitted) (noting that the court "must not question the employer's selection decision on the basis of qualifications, but instead, decide whether there is sufficient evidence of discrimination offered to show that the defendant's stated reason was a pretext"). Even if the Court accepts plaintiff's premise that the fact that others had a higher opinion of plaintiff's work meant that Ford was lying (as opposed to simply coming to another reasonable conclusion), the record does not show that anyone contradicted Ford's version of events. To the contrary, the

defendant has extensively documented complaints about plaintiff's performance from other employees and supervisors.

During the EEO investigation, plaintiff's primary contact in the Baltimore Field Office Stephen Taylor described plaintiff's work as "below average" and said that plaintiff was not an effective communicator and was unfamiliar with radio communications in a law enforcement context. Def. Ex. 23, Taylor Aff. at 6. Taylor also stated that he received several complaints from agents regarding plaintiff's failure to timely provide technical assistance. *Id.* Caldwell and Ford both reported that Taylor complained to them about plaintiff. *See* Def. Ex. 12, Ford Dep. at 161:16; Def. Ex. 14, Caldwell Dep. at 101:14-102:18. Plaintiff's other supervisors, Caldwell and Bowks, also testified that plaintiff's work was unsatisfactory and that he was frequently in need of assistance even on simple tasks. *See* Def. Opp. at 15-16 (citing Caldwell and Bowks depositions).

Plaintiff cites three evaluations provided by coworkers at plaintiff's request in 2003 that supposedly rebut Ford's appraisal of plaintiff's work. Def. Ex. 22 at 13-15. While the coworker evaluations are generally positive, they are also very short (several sentences of narrative) and general. *Id.* Taylor's evaluation is particularly brief, describing plaintiff's assigned responsibilities in general terms without any specific examples of good work. *Id.* at 13. None of the evaluations contradict Ford's accounts of specific incidents where plaintiff failed to adequately perform. *Id.* at 13-15. Because there is no evidence of "glaring errors" that would be "probative of pretext," *Grosdider*, 709 F.3d at 26, any evidence that plaintiff was performing better than Ford reported does not show that plaintiff's placement on the PIP was pretextual.

*Plaintiff can offer no other reason to discredit Ford's assessment of his work*:  Plaintiff argues that Ford's assessment of plaintiff's performance should not be credited because Ford did not properly evaluate plaintiff's work.  Plaintiff's states that during the 2002-2003 evaluation period, Ford "never conducted an office visit" to the Baltimore Field Division and therefore did not "learn about various telecommunications projects [plaintiff] had completed." Pl. Ex. 2 at 8.  Therefore, plaintiff complains, Ford did not take his accomplishments into account when Ford put plaintiff on the PIP.  In addition, plaintiff argues that it was impossible to complete some of the tasks Ford cited in the PIP notice as evidence of plaintiff's unsatisfactory performance, particularly the incident involving the broken radio. *See* Def. Ex. 2 at 3. Once again, the law does not support plaintiff's argument.

Plaintiff is essentially asking this Court to set specific criteria for the evaluation of ATF employees.  But Title VII "does not authorize a federal court to become a super-personnel department that re-examines an entity's business decisions." *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 114-15 (D.D.C. 2004) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).  In any event, it does not appear that a visit to the Baltimore Field Division would have been necessary to evaluate plaintiff's work.  According to plaintiff's main contact in the Baltimore Field Office, Stephen Taylor, plaintiff spent "very few days actually working on Baltimore Field Division radio issues" and the "majority of Mr. Khan's work was performed at the Radio Communication Branch." Def. Ex. 23 at 8.   Ford was plaintiff's direct supervisor for more than two years, worked in close proximity with plaintiff, and was in contact with plaintiff's other coworkers and supervisors.  Ford therefore had more than enough information to accurately evaluate plaintiff for placement on the PIP.

Plaintiff's argument that he was graded on the basis of unfair tasks does not help him.  It is not enough to "show that a reason given for a job action is not just, or fair, or sensible." *Francis v. District of Columbia*, 731 F. Supp. 2d 56, 71 (D.D.C. 2010) (quoting *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir. 1996)).  Plaintiff has not shown, as he must, that Ford did not "honestly believe the reason [he] offer[ed]. *Francis*, 731 F. Supp. 2d at 71 (citation omitted).  In any event, McGinnis pointed out in the Decision to Remove, plaintiff should have submitted an evaluation informing his supervisors that the radio was broken, as that would have been important information in evaluating whether to purchase the radio. Def. Ex. 19 at 66.  As for the fact that the replacement radio came without instructions, McGinnis pointed out that the manuals "were in the office and another technician assigned with the same task had no difficulty completing the task." *Id*.  Even leaving aside the small handful of incidents where plaintiff states that the assigned task was impossible, the record reflects ample reason ample justifications for Ford's decision to place plaintiff on the PIP. *See* Def. Ex. 15

### 2.  Plaintiff fails to show that retaliation or discrimination was the true reason for defendant's actions

In his EEO complaints, plaintiff contends that the "only reason that Sam Ford gave [him] a negative mid-year evaluation rating  put [him] on a PIP and subsequently had him removed from ATF was because of [plaintiff's] earlier EEO activity, [and his] religion, race, and ethnicity." Def. Ex. 3, June 26, 2004 EEO Complaint at 2.  Courts have recognized several ways a plaintiff can demonstrate that a stated reason is pretextual and that discrimination was the actual reason for an adverse decision.  A plaintiff may rely on "direct evidence" of discrimination; that is, evidence "if believed by the fact-finder, establishes the fact in question without any need for an inference,

including statements or documents showing a discriminatory or retaliatory animus on their face."

*Manuel v. Potter*, 685 F.Supp.2d 46, 60 n. 11 (D.D.C. 2010). A plaintiff may also attempt to

"produce evidence suggesting that the employer treated other employees of a different race, color,

religion, sex, or national origin more favorably in the same factual circumstances." *Brady*, 520 F.3d

at 495 (citations omitted).

   *Plaintiff cannot show that any hostility Ford may have had was the result of discrimination*:

Plaintiff argues that Ford's treatment of him was "belligerent, insulting, and highly discriminatory."

Def. Ex. 3 at 2. Plaintiff states that he was treated worse than his other coworkers in terms of training

and job assignments, and was often required to perform menial tasks. Def. Ex. 2 at 2. According to

Khan, Ford "publicly criticized his performance" and embarrassed him in front of other coworkers.

Def. Ex. 3 at 2. Plaintiff also contends that Ford treated him differently by refusing to allow plaintiff

to maintain an office at the Baltimore Field Division and requiring plaintiff to continue to report to

the Gaithersburg office. Def. Ex. 2 at 7. Plaintiff alleges that coworkers were permitted to maintain

offices at the field divisions they serviced, and that plaintiff had "no purpose to serve" in the

Gaithersburg office "except performing menial tasks on a full time basis for Mr. Ford." *Id.*

However, accusations that Ford's treatment of him was hostile and unfavorable compared to other co-

workers is not evidence of racial and religious discrimination. *Cf. Barber v. C1 Truck Driver*

*Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011) (allegation that supervisor treated plaintiff "with a

'rude and sour attitude' does not support an inference of discriminatory animus.").

   Plaintiff does allege that individuals other than Ford made derogatory comments regarding

plaintiff's race, religion, and national origin. But even assuming that these events happened exactly

- 24 -

as plaintiff described, these incidents are not evidence that any of the relevant decisionmakers were motivated by discrimination. Following the attacks of September 11, 2001, his then-supervisor James Bowks told plaintiff that he could not provide technical support at the Pentagon or in New York City because Bowks considered Plaintiff to be a "security risk" because plaintiff was a Muslim. *See* Pl. Opp. at 30; Pl. Ex. 10 at 42:8-21. Plaintiff also alleges that Bowks stated that American Muslims should be "put in quarantine like Japanese Americans and their civil liberties should be terminated." *Id.* at 43:6-12.

While these comments are completely inappropriate and unacceptable, Bowks was not the person who made the employment decisions that adversely affected plaintiff. *See Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 99 (D.D.C. 2005) *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007) (noting that "in a Title VII case, evidence of racial comments is not probative of any issue in the case unless it is linked to relevant personnel actions") (quoting *Figures v. Board of Pub. Utils.*, 967 F.2d 357, 360–61 (10th Cir.1992)). In fact, Bowks was only plaintiff's supervisor for approximately one month after he allegedly made those comments. In October of 2001, Sam Ford was promoted and became plaintiff's supervisor. Def. Facts at ¶10. Plaintiff alleges that it was Ford—not Bowks—who allegedly gave him lower ratings than he deserved, gave him inappropriate tasks, and unfairly placed him on the PIP in an effort to get him removed from employment as part of a "mean-spirited" vendetta. *See* Pl. Opp. at 23-25. But plaintiff has provided no evidence that Ford ever made any derogatory comments regarding Muslims or people of South Asian descent. The fact that Bowks or other co-workers had a racial or religious animus is not sufficient, because there is no "nexus between the racial animus and the employment decision." *Nurriddin v. Goldin*, 382 F. Supp.

2d 79, 99 (D.D.C. 2005) *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007) (citing *Cone v. Longmont United Hosp. Assoc.*, 14 F.3d 526, 531 (10th Cir.1994) ("isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions")).

*Plaintiff fails to produce evidence that similarly situated individuals were treated more favorably*:  Plaintiff states that between 1999 and 2003, "all of Plaintiff Khan's colleagues, each of whom was not of Middle Eastern heritage, Pakistani Nationality, or Muslim religion, were selected for promotion while Khan was not." Pl. Opp. at 8.  In his affidavit, plaintiff lists the eleven other communications specialists at the Radio Branch when he started working at the ATF, and notes that all but one of them (James Bowks, who is black) are white.  Pl. Ex. 2 at 31-32.  Plaintiff states that all of these individuals except himself and one other person were promoted to the GS-13 level. *Id.* Likewise, Plaintiff asserts that he was treated differently than his other colleagues in terms of training and work assignments.  Pl. Ex. 2 at 5.  Plaintiff complains that he was given ministerial and clerical tasks and that his work was not credited at the same level as his peers. *Id.* at 5-9.

In order to show discrimination based on disparate treatment, a plaintiff is "required to demonstrate that all of the relevant aspects of [his] employment situation were 'nearly identical'" to the employee promoted above him.  *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting *Pierce v. Commonwealth Life Ins. Co*., 40 F.3d 796, 802 (6th Cir.1994)).  But plaintiff has no "evidence as to the respective positions, location of job, supervisors, and/or job duties of each of these allegedly comparable employees." *Felder v. Johanns*, 595 F. Supp. 2d 46, 69 (D.D.C. 2009).   Plaintiff has given provided no such evidence regarding the eleven other

communications specialists.  Plaintiff states that he was "better educated, equally experienced, and equally rated in performance appraisals with his peers," Pl. Opp. at 7, but provides no evidence of his abilities compared to his colleagues.   Therefore, plaintiff cannot show disparate treatment.

### 3.  The record does not support an inference of retaliation:

Plaintiff asserts that the decision to put him on the PIP was retaliation for his informal EEO complaint in March of 2002. Plaintiff alleges that he complained about Ford to the EEO office of ATF because plaintiff was "being treated differently" from other employees.  Pl. Opp. at 27. According to plaintiff, the "EEO Office response was one of indifference," and the office informed Ford of the complaint. *Id*.  Ford then allegedly "commenced a relentless and vicious attack against Plaintiff Khan." *Id.*  Plaintiff argues that prior to his first EEO complaint in March of 2002, he had received very high performance reviews, and that "the only material and substantive difference in circumstances was . . . Plaintiff Khan had complained about his first-line supervisor (specifically, Sam Ford) to Ms. Marlene Curry of the EEO Office of ATF."  Pl. Opp. at 19 (citing Pl. Ex. 2 at 5) (emphasis in original).

"To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action."  *Pierson v. Washington Metro. Area Transit Auth*., 821 F. Supp. 2d 360, 368 (D.D.C. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67-69 (2006). Though at this stage of the litigation it is not necessary to decide whether the plaintiff has established his prima facie case, "[t]he strength of the plaintiff's prima facie case, especially the existence of a

causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action." *Pierson*, 821 F. Supp. 2d at 368.

Plaintiff is unable to show a causal connection between his speaking to the EEO and the alleged retaliation. Plaintiff states that his problems with Ford escalated "first gradually then dramatically" following his March 2002 EEO complaint. Pl. Mem. at 20. Plaintiff alleges that December of 2002, "Samuel Ford continued to assign a large number of tasks that [were] incompatible with [his] position description. He gave me tasks he knew I was physically unable to do, and used my performance thereon as an excuse to mark down my ratings." Def. Ex. 2, at 7. The fact that by plaintiff's own account, the alleged retaliatory activities had begun before plaintiff spoke with the EEO severely undermines plaintiff's assertion that his EEO activity caused defendant to treat plaintiff more unfavorably. In addition, if Ford had wanted to retaliate against plaintiff by giving him a false bad review, he had an opportunity to do so much earlier than he allegedly did. Ford acknowledges that he was informed of plaintiff's complaint in early 2002. Def. Ex. 20 at 3. Several months later, in December 2002, Ford gave plaintiff an overall satisfactory review (though it did contain some negative feedback) for the period September 2001 through October 2002. It was not until March 2003—a full year after plaintiff spoke to the EEO—that Ford informed plaintiff that he was performing below expectations. *See Gustave-Schmidt*, 360 F.Supp.2d 105, 118-19 (D.D.C. 2004) (three months is the outer limit for a temporal showing of causation).

**B. Plaintiff fails to rebut defendant's explanation for his suspension following the GOV incident**

Plaintiff claims that he was subjected to discrimination and/or retaliation when he received a seven day suspension for 1) Failure to Report an Incident Involving a Government Furnished

Automobile; and 2) Providing False Statements to [a] Law Enforcement Officer. Plaintiff states that the disciplinary action was "totally unwarranted" and that he had "thoroughly refuted" the allegations that he had made false statements to the police officer through plaintiff's sworn denial. Pl. Opp. at 26. Plaintiff states that there was a lack of evidence supporting the police's officer's assertion that plaintiff had falsely stated that he was on official business at the time of the citation. *Id.* Plaintiff also points to "[s]everal other unusual aspects of this matter," including "the police officer in contacting Plaintiff Khan at his residence" that he asserts undermine the case against plaintiff.

Once again, the issue is not whether plaintiff actually lied to the police officer, but whether McGinnis honestly believed that plaintiff did so. *See Brady*, 520 F.3d at 495 ("the issue is whether the *employer honestly and reasonably believed* that the underlying . . . incident occurred.") (emphasis in original). The record shows that plaintiff was suspended after an ATF investigation determined that plaintiff had made false statements. *See* Def. Ex. 15. Though plaintiff questions the soundness and thoroughness of that investigation, he has proffered no evidence that McGinnis's explanation was pretextual or unworthy of credence.

As to the charge that plaintiff failed to report the incident to his supervisor, plaintiff offers no denial but simply argues that he did not believe he was required to report the incident and that he believes that the penalty was disproportionately harsh. Def. Ex. 15 at 13. But absent evidence of pretext and discriminatory motive, plaintiff's own opinion of the harshness of the penalty is irrelevant. *See Francis v. District of Columbia*, 731 F. Supp. 2d 56, 71 (D.D.C. 2010) (noting that it is not enough to "show that a reason given for a job action is not just, or fair, or sensible." (quoting *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996))).

McGinnis explained in his decision to suspend plaintiff that plaintiff "should have known" that ATF policy requires all citations, no matter how minor, to be reported." Def. Ex. 15 at 2. Plaintiff cannot show that McGinnis's determination was either false or unreasonable.

### C. Plaintiff cannot rebut defendant's legitimate explanation for the events leading up to his proposed termination.

Plaintiff alleges he was discriminated and/or retaliated against in September of 2003 when his PIP was extended and he was relieved from his official duties as a Telecommunications Specialist. Plaintiff argues that Ford's decision to extend the PIP and relieve him of his responsibilities to provide support to the Baltimore field office was part of Ford's "mean-spirited" plan to put plaintiff in a position where only Ford could evaluate him, thus giving Ford a "clear path to initiate and present to Plaintiff Khan on December 10, 2003, both an Unsatisfactory Performance Appraisal . . . and a Notice of Proposed Removal." Pl. Opp. at 27-28. Plaintiff asserts that "the PIP terms and conditions were fully met by [plaintiff] and not recognized by Supervisor Ford, or were distorted or defeated by Ford's own malicious actions." Pl. Opp. at 25 (citing Pl. Ex. 2 at 7-9, 14-17, 18-22; Pl. Ex. 10 at 93-98, 102-05). However, plaintiff has proffered no evidence to rebut defendant's explanations for these events.

*Extension of the PIP and removal of Baltimore responsibilities:* According to Ford, plaintiff was relieved of his Baltimore field duties "so he could devote 100% of his time and efforts towards successfully completing the PIP within the allotted framework," and home-to-work privileges were not necessary because plaintiff would no longer be conducting field work. Def. Ex 20 at 7, 8. Ford also stated that the PIP was extended for 20 days to make up for the five business days plaintiff

missed while he was suspended and twelve days of sick leave that plaintiff took during the original 90 day term of the PIP.

Plaintiff asserts that Ford's real motivation was to "remov[e] Khan from his highly successful and sustained performance" at the Baltimore Field Divisions so that "Khan's field support base" could no longer "continue to observe and comment upon Khan's demonstrated excellent professional support, expertise, and conduct." *Id* at 27. Plaintiff explains taking away his travel requirements, Ford could "remove . . . indicia of bona fides, such as the use of his assigned Government vehicle for home-to-work-travel." *Id.*

Plaintiff's bare-faced accusations have no support in the record and are legally insufficient to rebut Ford's explanation that the PIP was extended and plaintiff's duties were reduced in order to help plaintiff. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Plaintiff's second line supervisor, Brad Caldwell, corroborated Ford's version of events. Def. Ex. 10, Caldwell Aff., at 6. In any event, the record does not show that additional reviews from the Baltimore Field Office would have helped plaintiff given the complaints his main contact Stephen Taylor had made about Khan's performance at that office. *See* Def. Ex. 23 at 6.

*Failure to complete PIP and Notice of Proposed Removal:* Plaintiff asserts that "the PIP terms and conditions were fully met by [plaintiff] and not recognized by Supervisor Ford, or were distorted or defeated by Ford's own malicious actions." Pl. Opp. at 25 (citing Pl. Ex. 2 at 7-9, 14-17, 18-22; Pl. Ex. 10 at 93-98, 102-05). Plaintiff argues that the written and oral rebuttals he made during his appeal provide a "point-by-point, documented rebuttal to each of the allegations of Supervisor Ford" in the 2003 "Unsatisfactory" appraisal and the Notice of Proposed Removal. Pl. Opp. at 28. Plaintiff

asserts that McGinnis, who reviewed the record and issued the Decision to Remove for Unsatisfactory Performance on April 7, 2004, was not competent to review plaintiff's performance. According to plaintiff, McGinnis is not an "expert in radio" and "had never even observed Mr. Khan's work product, much less evaluated his work performance." *Id.* at 29

Like plaintiff's argument that he should not have been put on the PIP in the first place, plaintiff's proffered evidence that he successfully completed the PIP—or would have done so absent Ford's unfair tactics—does not indicate pretext or that the real reason was retaliation or discrimination. The December 10, 2003 "Proposed Removal Based on Unsatisfactory Performance" details the ways that plaintiff was still unable to demonstrate proficiency and lists specific examples of technical and professional shortcomings. *See* Def. Ex. 18. Plaintiff has not provided any evidence, or even any logical connection, between these negative evaluations and plaintiff's EEO actions or his race, ethnicity, or religion beyond his own personal beliefs.

Plaintiff's argument that someone with greater technical abilities other than McGinnis should have reviewed plaintiff's case has no merit. McGinnis was the head of plaintiff's division, and plaintiff provides no evidence that the agency did not follow standard procedures when McGinnis issued the decision to remove plaintiff. McGinnis's April 7, 2004 Decision to Remove for Unsatisfactory Performance demonstrates that McGinnis read Khan's written materials and listened to his oral rebuttals, but did not find Plaintiff's argument persuasive. *See* Def. Ex. 19. To impose further specific technical or procedural requirements to an agency's employee review process would make the Court a "super-personnel department," *Gustave-Schmidt*, 360 F. Supp. 2d at 114-115. The Court does not have that authority.

## IV.    Conclusion

Because plaintiff has not provided sufficient evidence that any of defendant's actions against plaintiff were the result of discrimination or retaliation, the Court GRANTS the Defendant's Motion for Summary Judgment.

**SO ORDERED.**

March 31, 2014

Thomas F. Hogan
UNITED STATES DISTRICT JUDGE